IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,987

STATE OF KANSAS,
*Appellee*,

v.

RYAN C. PFANNENSTIEL,
*Appellant*.

SYLLABUS BY THE COURT

1.

Sexual battery under K.S.A. 2014 Supp. 21-5505(a) is a lesser included offense of aggravated sexual battery under K.S.A. 2014 Supp. 21-5505(b).

2.

Even if an appellate court determines that a lesser included offense instruction was legally and factually appropriate and should have been given, if the defendant failed to request the instruction, an appellate court will not reverse a conviction unless it is firmly convinced the jury would have reached a different verdict had the lesser included offense instruction been given—that is, unless the appellate court determines the failure to give the instruction was clear error.

3.

The Sixth Amendment to the United States Constitution does not guarantee a criminal defendant the right to choose which court-appointed attorney will represent him or her. A defendant who files a motion for new counsel must show justifiable dissatisfaction with his or her appointed counsel. Justifiable dissatisfaction can be

1

demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.

4.

By articulating dissatisfaction with his or her court-appointed attorney, a criminal defendant triggers a district court's duty to inquire into a potential conflict of interest.

5.

A district court abuses its discretion if it becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry.

6.

Even if a district court conducts an inquiry into a defendant's claim of dissatisfaction with his or her attorney, an abuse of discretion can be found if the district court failed to conduct an "appropriate" inquiry, that is an inquiry that fully investigates (1) the basis for the claim and (2) the facts necessary for determining if that dissatisfaction justifies appointing new counsel.

7.

If a district court conducts an appropriate inquiry into a defendant's expression of dissatisfaction with his or her attorney, an appellate court reviews a district judge's decision on whether to appoint substitute counsel for an abuse of discretion.

8.

When considering a motion for substitute counsel, a district court need not appoint new counsel until the court determines that the defendant has established justifiable dissatisfaction with his or her current counsel.

9.

A district court may ask questions of counsel when inquiring into a potential conflict of interest for the purpose of determining if a defendant has a justifiable dissatisfaction with court-appointed counsel. However, the court must avoid improperly requiring counsel to disclose any of the defendant's confidential communications. As well, in addressing the inquiry, counsel must carefully provide only a factual recitation and not shift to advocating against the defendant's position.

Review of the judgment of the Court of Appeals in an unpublished opinion dated May 3, 2013. Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed September 25, 2015. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Scott L. Anderson*, legal intern of the same office, was with him on the brief for appellant.

*Natalie A. Chalmers,* assistant solicitor general, argued the cause, and *Evan C. Watson*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  After a jury convicted Ryan C. Pfannenstiel of aggravated sexual battery, he raises two issues on appeal. First, he argues the district court should have given a lesser included offense instruction allowing the jury to consider sexual battery.

Because Pfannenstiel did not request the instruction, we will reverse only for clear error, and Pfannenstiel fails to firmly convince us that the jury would have reached a different verdict if the lesser included offense instruction regarding sexual battery had been given. Second, Pfannenstiel argues the district court erred in failing to appoint new, conflict-free counsel during a hearing on his motion to dismiss trial counsel. We hold that Pfannenstiel failed to establish a right to new counsel.

Consequently, we affirm Pfannenstiel's conviction.

FACTUAL AND PROCEDURAL BACKGROUND

Pfannenstiel's conviction arose from a complaint made by C.W. According to statements made to investigating officers, on September 21, 2011, C.W. visited a bar and grill in Conway Springs with her parents, a family friend, and her boyfriend. Shortly before she left the bar for the evening, she smoked on the patio and then went back into the bar. As she stepped in, she shook hands with an acquaintance who was an employee of a carnival that was in town. Pfannenstiel, who also worked for the carnival, stood nearby. He and C.W. also shook hands, and Pfannenstiel said something like, "'Yeah, you live next to us,'" or, "'Hello, neighbor.'" C.W. found it "creepy" that Pfannenstiel knew they were neighbors.

C.W. told investigators that she and her boyfriend went to their apartment around 10:15 p.m. She prepared something for her boyfriend to eat and then fell asleep in her bed. Sometime that night, she sensed the bed moving and felt a couple of brushes against her arm followed by "a moisture feeling" and a sucking sensation on her arm. She opened her eyes to find a man kneeling next to her bed. C.W. immediately elbowed the man and

4

yelled to her boyfriend that there was someone in the apartment. Her boyfriend chased the man out of the apartment while C.W. called the police.

The police later located Pfannenstiel, who matched C.W.'s description of her assailant. Pfannenstiel told officers C.W. had invited him over. He indicated that when the bar closed he went to her house, crawled through her window, and whispered, "'I'm here.'"

That evening, police swabbed the area of C.W.'s arm where she had felt the moist, sucking sensation. They swabbed the same area the next day. Analysts obtained a DNA mixture from at least two individuals on both swabs, and both swabs revealed a major DNA profile that matched a known sample taken from Pfannenstiel.

The State charged Pfannenstiel with aggravated sexual battery and aggravated burglary. At trial, he testified that he was hanging out at the bar with some friends when he was introduced to and shook hands with C.W. After that, he went outside to smoke a cigarette. When he came back inside, she engaged him in conversation. She said she had seen him walk past her apartment the day before and that her apartment was the one with the windows open. He explained that the carnival trailers were on the same street as her apartment and he had noticed that her windows had been open for 3 days. She invited him to come over to her apartment "'a little later.'" He jokingly said, "'If the door–you don't come to the door, I can come through the window.'" She replied, "'Yes[,] you can.'" He told her he would come by a little later.

Pfannenstiel said he left the bar and went back to his trailer for about 2 hours. He recalled C.W. inviting him over, so he went to her apartment and knocked on the door. When C.W. did not answer, he went through the living room window and into her

5

bedroom. He touched her arm and whispered, "'I'm here. Wake up.'" She woke up, hit him in the mouth with her elbow, and screamed for her boyfriend who chased him out of the apartment. He denied kissing, sucking, or licking C.W.'s arm. He recalled that she had a blanket halfway over her but could not recall if his skin touched her skin. He testified her arm "most likely" was covered when she hit him in the mouth.

C.W. testified that she denied telling Pfannenstiel where she lived, asking him to come over, or telling him to come through her window. She also described being asleep and not opening her eyes until after she felt the moist, sucking sensation. When specifically asked if she was unconscious, C.W. replied, "I was asleep."

The jury acquitted Pfannenstiel of aggravated burglary but found him guilty of aggravated sexual battery. Nine days later, he filed a pro se motion to dismiss counsel due to ineffective assistance. As discussed more fully below, the district court took up the matter prior to sentencing. The court questioned Pfannenstiel and defense counsel about the allegations and allowed the State to respond. The district court denied Pfannenstiel's motion, and defense counsel then proceeded to represent Pfannenstiel on a motion for acquittal and at sentencing. The district court denied the motion for acquittal and sentenced Pfannenstiel to 34 months' imprisonment.

Pfannenstiel appealed, arguing the district court should have instructed the jury on the lesser included offense of sexual battery and that he should have been appointed conflict-free counsel at the hearing on his pro se motion to dismiss counsel. The Court of Appeals affirmed in *State v. Pfannenstiel*, No. 107,987, 2013 WL 1876462 (Kan. App. 2013) (unpublished opinion). This court granted Pfannenstiel's petition for review on the same issues.

6

ISSUE 1: *The District Court Did Not Commit Clear Error by Failing to Give the Lesser Included Offense Instruction.*

In Pfannenstiel's first argument, he contends the district court committed clear error by failing to instruct the jury on the lesser included offense of sexual battery. Under K.S.A. 2014 Supp. 21-5505(a), "[s]exual battery is the touching of a victim who is not the spouse of the offender, who is 16 or more years of age and who does not consent thereto, with the intent to arouse or satisfy the sexual desires of the offender or another." To prove aggravated sexual battery as charged in this case, the State was required to prove those same elements, except for the spousal relationship, plus show that the victim was "unconscious or physically powerless" when the touching occurred. K.S.A. 2014 Supp. 21-5505(b)(2). Pfannenstiel argues the jury could have found him guilty of the lesser offense because the evidence, at best, only vaguely suggested that C.W. was unconscious at the time of the incident, and thus the evidence did not conclusively show *aggravated* sexual battery.

1.1. *Standard of review explained*

When analyzing jury instruction issues, we follow a three-step process:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

Our first and third steps are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step. See, *e.g.*, *State*

*v. Briseno*, 299 Kan. 877, 882, 326 P.3d 1074 (2014) (describing a "higher hill for a party that fails to request an instruction"); *Williams*, 295 Kan. at 515-16; see also K.S.A. 2014 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). Here, Pfannenstiel did not request the lesser included offense instruction. Hence, Pfannenstiel must establish clear error. K.S.A. 2014 Supp. 22-3414(3).

At the second step of determining whether there was any error at all, we "'consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.'" *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *Williams*, 295 Kan. 506, Syl. ¶ 4); see also *State v. Plummer*, 295 Kan. 156, 160-63, 283 P.3d 202 (2012) (utilizing a four-step review of jury instructions, in which the second and third steps ask whether any error occurred, first from a legal standpoint and then from a factual one).

Finally, because Pfannenstiel did not request the instruction, even if we determine that the district court erred in failing to give the lesser included offense instruction we will not reverse the verdict unless Pfannenstiel convinces us that the district court committed clear error. To find clear error, we must be "firmly convinced that the jury would have reached a different verdict if the instruction had been given." *State v. Cameron*, 300 Kan. 384, 389, 329 P.3d 1158, *cert. denied* 135 S. Ct. 728 (2014).

1.2. *Failure to give lesser included offense instruction was not clear error*

We agree with Pfannenstiel that sexual battery is a lesser included offense of aggravated sexual battery. K.S.A. 2014 Supp. 21-5109(b)(1) defines a lesser included offense as one that is a "lesser degree of the same crime," and sexual battery and

8

aggravated sexual battery are different degrees of the same crime. See K.S.A. 2014 Supp. 21-5505(c) (defining sexual battery as a class A person misdemeanor and aggravated sexual battery as a severity level 5, person felony). Typically, because we have determined that the lesser included instruction would have been legally appropriate, we would next consider whether the instruction would have been factually appropriate. But that discussion is not necessary here because, even if we assume the lesser offense was factually appropriate, Pfannenstiel fails to convince us the district court committed clear error.

In suggesting clear error occurred, Pfannenstiel argues there are two ways a jury would have a reasonable doubt about whether C.W. was unconscious when the touching took place. First, he contends the jury could have believed that C.W. was conscious enough to have reached some assumptions about the initial brushing feeling. For example, C.W. was apparently aware enough to think that her boyfriend caused the initial movement of the bed. Second, the jury could have found that Pfannenstiel initially touched C.W. with the intent to wake her and that the touching with intent to arouse or satisfy sexual desires did not occur until C.W. was clearly awake and felt the moist feeling on her arm. Neither argument persuades us.

His first argument hinges on whether the jury would have determined C.W. was conscious. He admits C.W. was sleeping when he first touched her and that he said, "'Wake up.'" But he argues the fact she was able to formulate the thought that her boyfriend was coming to bed must mean she gained consciousness. Yet, when questioned, C.W. stated she was asleep when she felt the moist, sucking sensation.

Kansas law does not define "conscious," which is, of course, a word of common understanding. See *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014) (A

9

district court does not have to provide the jury a definition for widely used words or those readily comprehensible by individuals of common intelligence.).

Other courts have determined that "unconsciousness" includes (a) deep sleep, (b) the state of sleep between deep sleep and waking, and (c) the state of going to sleep but not yet in deep sleep. See *Ballew v. Aiello*, 422 S.W.2d 396, 399 (Mo. App. 1967) (in case of "sound sleep" or of "dropping off to or awakening from sound sleep. . . . there is no conscious or voluntary action or no volition"); *State v. Newman*, 353 Or. 632, 641, 302 P.3d 435 (2013) (referring to dictionary definition of "conscious" and concluding "[t]hat definition associates consciousness with a wakeful state and implies that a person in a state of sleep cannot execute a conscious action"); see also Webster's II New College Dictionary 239, 1200 (1999) (defining "unconscious" as "[w]ithout conscious thought or feeling . . . . [b]eing without conscious control"; defining "conscious" as "[c]apable of thought, will, or perception. . . . [t]he component of waking awareness perceptible by an individual at a given instant"). Jurors applying their common sense to determine the ordinary meaning of "unconsciousness" would reach the same conclusion about the definition of consciousness. From their common experiences, jurors could relate to someone reaching a state of full wakefulness (*i.e.*, consciousness) with the realization that he or she had felt or heard something while asleep (*i.e.*, in an unconscious state) and subconsciously formed a thought or sense about the sound or feeling.

Applying that to the facts of this case, we are not firmly convinced that the jury would accept that C.W. was conscious when she interpreted the movement of the bed and the brushes against her arm as her boyfriend coming to bed. Indeed, the evidence suggests that it was the moist, sucking sensation, rather than the brushing or shaking, that brought C.W. to full consciousness. Even Pfannenstiel's version of facts suggested that C.W.'s immediate response upon realizing he was by her bed was to cry out for help and

10

strike him with her elbow—both of which happened after Pfannenstiel sucked on her arm.

Furthermore, the evidence weighs against Pfannenstiel's second argument that any touching before C.W. awoke was merely an effort to wake her, not to arouse or satisfy sexual desires. Pfannenstiel admitted that C.W. awoke and screamed, causing him to flee. And C.W. testified it was the moist, sucking feeling that woke her—an act the jury could have believed that Pfannenstiel performed to satisfy his sexual desires. The physical evidence also supports the credibility of C.W.'s version of events. While Pfannenstiel suggests he might have deposited his DNA when he shook C.W.'s hand, this explanation seems improbable in light of the evidence that he was the major contributor to the DNA found on the part of C.W.'s arm where she described feeling the moist, sucking sensation. A reasonable jury would more likely believe Pfannenstiel deposited the DNA on C.W.'s arm by sucking, licking, or kissing than by shaking hands.

Hence, we hold the district court did not commit clear error because we are not firmly convinced the jury would have reached a different conclusion had the instruction been given.

ISSUE 2: *The District Court Did Not Commit Error by Failing to Appoint Substitute Counsel.*

After trial, but before sentencing, Pfannenstiel filed a pro se "Motion [t]o Dismiss Counsel Due to Ineffective Assistance of Counsel." Pfannenstiel opened his written motion by asking the district court to "dismiss the current Attorney of record . . . and appoint new Counsel." Pfannenstiel listed the reasons for his request in five numbered paragraphs. In the first paragraph, he referred to a similar pretrial motion in which he had requested new counsel. He renewed one of his pretrial complaints, specifically that

11

counsel had not subpoenaed all of his witnesses for trial. (The district court had denied the pretrial motion following a brief hearing.) In the second paragraph, Pfannenstiel stated that his attorney "lied to me and told me she would not cross examine my alleged accusers." Third, he complained that he had asked his attorney "to submit[] certain statements as evidence at trial that could change the outcome of trial." Next, he complained that his attorney "withheld the fact that I told her that I was gay. She also withheld certain statements and went as far as to help the prosecution at trial." Finally, he complained his attorney "told me I [was] guilty for these crimes," she "went as far as to use my own questions against me," and there were "10 women on my Jury."

The district court held a joint hearing addressing Pfannenstiel's pro se motion to dismiss counsel, a motion for judgment of acquittal and new trial which was filed by his attorney, and sentencing. The district court started by stepping through each paragraph of Pfannenstiel's motion to dismiss counsel, allowing Pfannenstiel to explain and support his allegations. The court asked Pfannenstiel questions and at two points asked questions of defense counsel—whether she had interviewed the witnesses Pfannenstiel wanted to have subpoenaed and whether she had provided him all discovery. Counsel responded that she had contacted some witnesses but had been unable to locate one, and she listed the discovery she had provided, which indicated she had shown or read him everything except for some pictures. In most respects, counsel's responses merely reported her actions. Counsel also reported that the witnesses she had been able to contact gave statements that conflicted with each other and with Pfannenstiel's statements and, because of those conflicts, she "did not believe that they would be of any use to us at trial and might undermine his testimony." Pfannenstiel responded that one of the witnesses, along with his mother who had talked to the witnesses, would disagree with counsel's representations. The judge also asked if defense counsel had any response she wanted to make after hearing all of Pfannenstiel's allegations, and she responded:

12

"Well, Judge, obviously I think Mr. Pfannenstiel has misunderstood some things I've told him, but I think the most important thing here is that we're at a crucial stage and that is sentencing. Obviously, from all of his concerns, I don't expect that he's going to believe that I'm handling sentencing. And he is a border box, Judge. We did discuss everything yesterday about that, and we did send him a letter. But in view of his serious apprehensions about my representation, I believe that perhaps it would be best to get another attorney to look at sentencing and maybe be able to work with him on–on that."

The prosecutor argued the victims had been waiting in the courtroom all day and none of the allegations "stand[] out remarkably as some error on [counsel's] part." The district court ruled:

"Well, here's my problem with this case. I mean, it's possible I could appoint a new attorney, and maybe the new attorney and Mr. Pfannenstiel would get along better. I don't know. But from what he is saying, I mean, it just seems to me that Mr. Pfannenstiel just– you know–the conflicts to–with his attorney, I think get back more than anything to his lack of understanding of courts and procedures, rather than anything improper that the attorney has done, so, you know, it strikes me that if I appoint a new attorney it's likely the new attorney is going to have the same kinds of problems crop up again with Mr. Pfannenstiel."

The district court accordingly denied Pfannenstiel's motion to dismiss counsel.

Before the Court of Appeals, Pfannenstiel argued he was entitled to conflict-free counsel at the hearing on his pro se motion to dismiss defense counsel. The Court of Appeals rejected this argument.

The Court of Appeals cited *State v. Kirby*, 272 Kan. 1170, 1194, 39 P.3d 1 (2002), which discussed a pro se motion for new trial based on alleged ineffective assistance of

13

counsel. The Court of Appeals noted that under the holding in *Kirby* a district court should make a preliminary examination to determine whether a motion raised substantial questions of law or fact. If not, the motion could be summarily denied. On the other hand, if the defendant raises substantial questions the court must appoint counsel and conduct a hearing. Applying *Kirby*'s holding to the instant facts, the Court of Appeals held that the district court had merely conducted a preliminary hearing, any questions of counsel were to determine whether substantial questions were presented, there was not a "trial-like confrontation," and, therefore, counsel was not required to be appointed. *State v. Pfannenstiel*, No. 107,987, 2013 WL 1876462, at *5 (Kan. App. 2013) (unpublished opinion).

While we disagree with the Court of Appeals' reliance on *Kirby*—a case dealing with a motion for new trial rather than a request for a new attorney—and, therefore, some of its reasoning, we affirm the Court of Appeals' holding.

### 2.1. *Nature of Pfannenstiel's rights explained*

Under the Sixth Amendment to the United States Constitution, Pfannenstiel had a right to effective assistance of counsel during all critical stages of the criminal proceeding. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014) (quoting *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 [2012]); *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013). This right extends to sentencing proceedings. *Stovall*, 298 Kan. 362, Syl. ¶ 6.

Courts have long recognized that the Sixth Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties. See, *e.g.*, *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d

14

220 (1981); *Sola-Morales v. State*, 300 Kan. 875, 894, 335 P.3d 1162 (2014); *State v. Sharkey*, 299 Kan. 87, 96, 322 P.3d 325 (2014); *Stovall*, 298 Kan. at 370. Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties, *Zuck v. Alabama*, 588 F.2d 436, 440 (5th Cir.), *cert. denied* 444 U.S. 833 (1979), and can include situations in which the caliber of an attorney's services "may be substantially diluted," *United States v. Hurt*, 543 F.2d 162, 166 (D.C. Cir. 1976); accord *State v. Prado*, 299 Kan. 1251, 1258, 329 P.3d 473 (2014).

A posttrial claim that counsel is ineffective most often seeks one of two remedies: (1) appointment of new counsel or (2) a request to set aside a conviction, either through a motion for a new trial or a motion to set aside a plea. Even with the most liberal of readings, we do not view Pfannenstiel's motion as one seeking a new trial, despite appellate counsel's valiant effort to parse Pfannenstiel's words in a way that might suggest this was in fact the underlying purpose of his motion. Pfannenstiel clearly—at the beginning and end of his motion—indicated his purpose was to obtain new counsel. And everything in between attempted to document and explain Pfannenstiel's lack of confidence in his attorney and examples of what he believed represented his attorney's poor communication.

As a result, rather than look to cases dealing with a motion for new trial, we will primarily rely on cases dealing with requests for appointment of new counsel, acknowledging as we do that both lines of cases share the same doctrinal basis and many of the same procedural rules, though some procedures and the ultimate test of determining the merits of the motion may differ. Compare *Brown*, 300 Kan. at 572, 575 (to obtain substitute counsel because of alleged "'lack of performance' by current

15

counsel," defendant "'must show "justifiable dissatisfaction" with his or her appointed counsel'"), with *Prado*, 299 Kan. at 1257, 1260 (court noted that defendant "does not assert a substitute counsel claim" but rather sought to withdraw his plea based on alleged conflict with counsel; court held defendant met the constitutional test defined in *Mickens v. Taylor*, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 [2002]); *Sharkey*, 299 Kan. at 96, 100-01 (in considering motions for new trial, court applied *Mickens*); *State v. Aguilar*, 290 Kan. 506, 513, 231 P.3d 563 (2010) (court distinguished the K.S.A. 22-3210[d] manifest injustice standard governing a post-sentence plea withdrawal motion, which requires meeting the *Mickens* constitutional ineffective assistance standard, from the good cause standard governing a presentence plea withdrawal motion where "[m]erely lackluster advocacy . . . may be plenty to support" the judge's exercise of discretion to allow the plea withdrawal).

The line of cases regarding a request for new counsel is largely premised on the principle that the Sixth Amendment does "not guarantee the defendant the right to choose which attorney will be appointed to represent the defendant." *Brown*, 300 Kan. at 575. Because the right to choose counsel is not absolute, it necessarily follows that a defendant does not have an absolute right to substitute counsel. Consequently, a defendant, such as Pfannenstiel, who files a motion for new counsel "'must show "justifiable dissatisfaction" with his or her appointed counsel,' which can be 'demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.'" 300 Kan. at 575 (quoting *State v. Wells*, 297 Kan. 741, 754, 305 P.3d 568 [2013]); see, *e.g.,* S*tate v. Burnett*, 300 Kan. 419, 449-51, 329 P.3d 1169 (2014) (court's inquiry of defense counsel revealed disagreement fell within range of counsel's professional judgment and did not constitute justifiable dissatisfaction); *State v. Smith*, 291 Kan. 751, 755, 247 P.3d 676 (2011) ("'"To warrant

16

the appointment of new trial counsel, a defendant must show 'justifiable dissatisfaction' with his or her appointed counsel."'").

Pfannenstiel's motion, in which he requested the dismissal of his court-appointed attorney and the appointment of new counsel, alleged several grounds that potentially established a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between himself and his attorney. Thus, his motion constituted "'"an articulated statement of attorney dissatisfaction,"' which will, in turn, "'trigger the district court's *duty* to inquire into a potential conflict"' of interest. (Emphasis added.) [Citations omitted.]" *Brown*, 300 Kan. at 575. This duty of inquiry exists regardless of the remedy sought as a result of the alleged conflict of interest, whether it be a new trial or new counsel. See, *e.g.*, *Wood*, 450 U.S. at 272 n.18 (citing C*uyler v. Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 [1980]); *Sharkey*, 299 Kan. at 98; *State v. Carter*, 284 Kan. 312, 321, 160 P.3d 457 (2007); *State v. Taylor*, 266 Kan. 967, 975, 975 P.2d 1196 (1999); *State v. Jenkins*, 257 Kan. 1074, 1084, 898 P.2d 1121 (1995).

This duty of inquiry can lead to three types of errors. Each of these errors is reviewed on appeal for an abuse of discretion. See, *e.g.*, *Brown*, 300 Kan. at 576; *Burnett*, 300 Kan. at 449; *Sharkey*, 299 Kan. at 98; *Stovall*, 298 Kan. at 370; *Wells*, 297 Kan. at 754; *Carter*, 284 Kan. at 321; *State v. Jasper*, 269 Kan. 649, 654-55, 8 P.3d 708 (2000). An abuse of discretion can occur if judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of

discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The first type of error—the one most frequently discussed in our opinions—occurs when a district court becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry. We have held that this failure constitutes an error of law—a failure to follow the law and fulfill a legal duty—and, thus, an abuse of discretion. *Brown*, 300 Kan. at 576; *Wells*, 297 Kan. at 753-54.

The second type of error occurs when a district court investigates the potential conflict but not appropriately—that is, the court fails to conduct what we often refer to as an "appropriate inquiry." See, *e.g.*, *Brown*, 300 Kan. at 575-76; *Burnett*, 300 Kan. at 449; *Sharkey*, 299 Kan. at 98-99; *Stovall*, 298 Kan. at 370; *Wells*, 297 Kan. at 754; *Carter*, 284 Kan. at 321; *Jasper*, 269 Kan. at 654-55. An appropriate inquiry requires fully investigating (1) the basis for the defendant's dissatisfaction with counsel and (2) the facts necessary for determining if that dissatisfaction warrants appointing new counsel, that is, if the dissatisfaction is "justifiable." See, *e.g.*, *Stovall*, 298 Kan. at 372 (affirming Court of Appeals' conclusion that district court failed to make an "in-depth inquiry" into counsel's potential conflict of interest); *Wells*, 297 Kan. at 755-56 (one, open-ended question sufficient because it gave defendant an opportunity to "suggest a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel" and defendant failed to articulate anything that warranted follow up); *State v. Bryant*, 285 Kan. 970, 991, 179 P.3d 1122 (2008) (court satisfied requirement by asking open-ended questions "to learn everything that was bothering" defendant and "fully hearing" complaints); *State v. Sappington*, 285 Kan. 158, 169, 169 P.3d 1096 (2007) ("court satisfied this requirement by fully hearing Sappington's complaints"); see also *Stovall*, 298 Kan. at 385-90 (Biles, J., dissenting in part and concurring in part) (discussing need

18

for inquiry to cover both [1] grounds for dissatisfaction complaint and [2] facts necessary to determine whether relief is warranted); *United States v. Baisden*, 713 F.3d 450, 454 (8th Cir. 2013) ("'The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'"); *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991) ("When a defendant raises a seemingly substantial complaint about counsel, the judge 'has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction.'").

Finally, even if a district court conducts an appropriate inquiry into a defendant's expression of dissatisfaction with his or her attorney, it can commit an abuse of discretion when determining whether to substitute counsel. See *Carter*, 284 Kan. at 321; *Taylor*, 266 Kan. at 977-78; *State v. Hegwood*, 256 Kan. 901, 903-04, 888 P.2d 856 (1995).

Here, Pfannenstiel concedes the district court initiated an inquiry in response to his motion. He contends that had the district court not had a hearing on his motion, he "might not have been entitled to conflict-free counsel." Nevertheless, because the district court did hold a hearing on his motion, Pfannenstiel asserts the district court was required to appoint him conflict-free counsel to represent him during that hearing. Pfannenstiel makes two associated arguments. First, he argues that because the State was represented at the hearing on his motion, he had the right to conflict-free representation. Second, he argues that a conflict of interest arose when the district court "called upon its court-appointed attorney to answer Mr. Pfannenstiel's allegations." He argues that conflict is per se prejudicial and entitles him to automatic reversal because substitute counsel must be appointed anytime the court inquires of defense counsel about a motion for substitute counsel. Pfannenstiel's arguments can be categorized as alleging that the district court abused its discretion by employing the wrong legal standard and in not conducting an appropriate inquiry—not because the inquiry was not thorough, as is typically the

argument raised on appeal, but because it went so far as to create an immediate right to substitute counsel and it created a conflict of interest. We conclude Pfannenstiel's arguments lack merit.

2.2. *Court inquiry does not give rise to right to substitute counsel*

In support of the argument that Pfannenstiel had a right to substitute counsel during the court's inquiry, he cites *State v. Pierce*, 246 Kan. 183, 188, 787 P.2d 1189 (1990), for the "general rule" that "'[i]f the trial court determines that a hearing should be held, then counsel should be appointed.'"

In *Pierce*, which involved a postconviction motion to modify sentence, the court noted Kansas' "comprehensive statutory scheme of legal representation for indigent persons in criminal matters." 246 Kan. at 187-88 (citing K.S.A. 22-4503 (Ensley); *State v. Andrews*, 228 Kan. 368, 373-75, 614 P.2d 447 [1980]). Nevertheless, the court held the statutory right to counsel did not extend to all postconviction motions. *Pierce*, 246 Kan. at 188 (citing K.S.A. 22-4503 (Ensley) [right to attorney during pretrial and trial proceedings]; *Andrews*, 228 Kan. at 375] [contrasting pretrial and trial proceedings from postconviction motions]; *State v. Jennings*, 240 Kan. 377, 378-79, 729 P.2d 454 [1986] [no right to counsel for hearing on motion to modify sentence if motion does not allege facts or circumstances which might justify a modification by the court]). But the court also held that "[i]f the trial court determines that a hearing should be held, then counsel should be appointed." *Pierce*, 246 Kan. at 188. Pfannenstiel focuses on this last holding to argue he should have been given counsel as soon as the court began asking questions and conducting a hearing, but he overlooks the fact that the defendant in *Pierce* sought a different remedy.

20

Significantly, in contrast to the facts in *Pierce*, Pfannenstiel did not ask for a new sentencing. Nor did he ask for a new trial, where, if the district court granted a hearing on such a motion, he might have been entitled to conflict-free counsel. See *Sharkey*, 299 Kan. at 95-96 (recognizing right to assistance of conflict-free counsel for purposes of arguing timely motion for new trial, but not for untimely one). Pfannenstiel only requested the removal of his trial counsel and the appointment of new counsel—the district court was not deciding whether trial counsel's representation entitled Pfannenstiel to a new trial. Pfannenstiel does not cite, and we have not found, any authority that extends the holding in *Pierce* or similar cases to a district court's inquiry about a defendant's articulation of dissatisfaction with counsel.

To the contrary, a long line of cases, both in Kansas and federal courts, impose a threshold burden on the defendant before a district court appoints new counsel in those cases:  A defendant must establish justifiable dissatisfaction with current appointed counsel before substitute counsel is appointed. See, *e.g.*, *Brown*, 300 Kan. at 575; *Burnett*, 300 Kan. at 449; *Wells*, 297 Kan. at 754; *Carter*, 284 Kan. at 321-23; *Jasper*, 269 Kan. at 654-55.

Rather than require automatic substitution of counsel at the hint of a potential conflict of interest, the United States Supreme Court has recognized that either a defendant or defense counsel might raise a potential conflict as the basis for seeking new counsel "for purposes of delay or obstruction of the orderly conduct" of the proceedings. *Holloway v. Arkansas*, 435 U.S. 475, 486, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). An inquiry assures any delay is for good cause, thereby avoiding automatically delaying proceedings by discharging the current counsel and appointing new counsel for all motions seeking substitute counsel, regardless of the motion's merits. In fact, federal courts routinely include timeliness or potential delay as one of the factors considered

when determining if a trial court abused its discretion in denying a motion for new counsel. See, *e.g.*, *United States v. Ryals*, 512 F.3d 416, 419 (7th Cir. 2008) (applying three-factor test, including timeliness of motion); *United States v. Lott*, 433 F.3d 718, 725 (10th Cir. 2006) (four-factor test, including timeliness of motion); *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001) (same); *United States v. Simeonov*, 252 F.3d 238, 241 (2d Cir. 2001) (applying three factors, including timeliness); *United States v. Corona-Garcia*, 210 F.3d 973, 976 (9th Cir. 2000) (applying three factors, including a weighing of "the timeliness of the motion against any inconvenience or delay that would result from granting the motion"); *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir. 1994) (applying three factors, including consideration of the "'public interest in proceeding on schedule'"); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir.1986) (applying three factors, including timeliness). But see *Jasper*, 269 Kan. at 653-54 (criticizing use of Kansas Court of Appeals adaptation of federal test but focusing on prong other than timeliness; court neither accepts nor rejects timeliness as an appropriate factor to be considered).

These multi-factor tests that federal courts utilize contradict Pfannenstiel's assertion that an inquiry into the basis of the motion for new counsel automatically gives rise to a right to have a new attorney appointed. Likewise, our past cases have held that a Kansas district court need not appoint new counsel until it finds, *after* its initial inquiry into the potential conflict of interest, that a defendant has established justifiable dissatisfaction with his or her current attorney. *Brown*, 300 Kan. at 575; *Wells*, 297 Kan. at 754. Pfannenstiel has failed to present any caselaw contradicting that long-standing holding. Nor has he argued here that the district court erred in not finding justifiable dissatisfaction, and an issue not briefed by an appellant is deemed waived and abandoned. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 10, 303 P.3d 680 (2013).

22

Thus, Pfannenstiel's argument that he was automatically entitled to new counsel to argue his motion fails regardless of the fact that the State's attorney was present at the hearing. Courts generally recognize that an inquiry conducted after a defendant's expression of dissatisfaction with his or her attorney will occur on the record and in the presence of the prosecutor but also recognize "[t]here may be unusual circumstances where, to avoid the possibility of prejudicial disclosures to the prosecution, the court may exercise its discretion to pursue the inquiry with defendants and their counsel on the record but in chambers." *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972). In this case, the record does not reflect the types of disclosures that would have warranted a hearing outside the presence of the prosecutor.

The district court did not abuse its discretion by conducting an inquiry without appointing substitute counsel for Pfannenstiel.

2.3. *Inquiry of counsel did not create a conflict of interest*

Next, Pfannenstiel argues a conflict of interest arose when the district court asked questions of his court-appointed attorney, such that he should have been appointed new counsel to represent him during the hearing. Again, caselaw suggests otherwise. Several Kansas cases reflect that the inquiry into the basis of the alleged conflict of interest often includes questions of the attorney. See, *e.g.*, *Burnett*, 300 Kan. at 449 (inquiry of defendant *and* counsel did not reveal justifiable dissatisfaction); *Carter*, 284 Kan. at 323 (same); *Jasper*, 269 Kan. at 654-55 (same). Similar situations can be found in federal cases. See, *e.g.*, *United States v. Rodriguez*, 612 F.3d 1049, 1054 (8th Cir. 2010) (colloquy included statements by defense counsel and prosecutor); *United States v. McKenna*, 327 F.3d 830, 843-44 (9th Cir. 2003) (discussing defense counsel's comments regarding motion); *United States v. Mullen*, 32 F.3d 891, 893 (4th Cir. 1994) (counsel

23

answered questions about contact with client); *United States v. Levy*, 25 F.3d 146, 154 (2d Cir. 1994) (trial judge "conducted extended colloquies" with defense counsel in effort to determine if conflict of interest existed). In fact, in *Ryals*, the Seventh Circuit Court of Appeals criticized a trial court for only asking two questions of defense counsel, indicating that the court should have "inquired further, asking why counsel could not carry on, what had caused the dispute between lawyer and client, and whether the breakdown in their relationship was beyond fixing." 512 F.3d at 420.

Nevertheless, the inquiry into whether a defendant has demonstrated justifiable dissatisfaction with his attorney requires both the court and defense counsel to walk a delicate line in making the inquiry. The Supreme Court has observed that judges must explore the basis of the alleged conflict of interest "without improperly requiring disclosure of the confidential communications of the client." *Holloway*, 435 U.S. at 487. Moreover, other courts draw a meaningful distinction between (1) an attorney truthfully recounting facts and (2) an attorney going beyond factual statements and advocating against the client's position. See *McKenna*, 327 F.3d at 843-44. This court drew the same distinction in *Prado*, 299 Kan. at 1259.

In *Prado*, Jorge Alberto Prado requested to withdraw his plea, alleging deficiencies in his counsel's performance during plea negotiations. We held those allegations triggered the district court's obligation to inquire into the alleged conflict. In addition, we noted that even if Prado's and his counsel's statements failed to alert the district court to the potential conflict, Prado's attorney put the court on notice of that potential when he went beyond facts, expressed a personal opinion about the merits of Prado's claim, and explicitly advocated against Prado's interest by explicitly saying, "'I didn't see a conflict.'" 299 Kan. at 1259.

24

Pfannenstiel likewise argues his "court-appointed attorney essentially advocated against him at a hearing on his pro se motion." But he does not point to specific statements of counsel. Instead, he argues that if appointed, conflict-free counsel "would have done further investigation" and he or she "may have been able to present other evidence to support Mr. Pfannenstiel's factual claims or at least subject the court-appointed attorney to vigorous cross-examination of her explanations regarding the alleged deficiencies." Again, however, Pfannenstiel must meet the threshold showing of justifiable dissatisfaction before counsel would be appointed, and he failed to do so. Further, from our review of the record, only two of defense counsel's comments approach the line of advocating against Pfannenstiel's position and neither one crosses it.

First, counsel made an evaluative statement regarding her strategy, indicating she felt Pfannenstiel's witnesses would not be helpful and might undermine his testimony. We have recognized that the decision on which witnesses to call is a matter of trial strategy left to the professional judgment of the attorney. See *State v. Foster,* 290 Kan. 696, 709, 233 P.3d 265 (2010). In *Foster*, this court rejected a defendant's conflict of interest claim and approved of a court's colloquy with a defendant and defense counsel in which counsel indicated he did not plan to call witnesses for the defense because those available "'will hurt me.'" 290 Kan. at 709. Pfannenstiel's counsel made essentially the same comment. The comment recounted counsel's strategic decision, a generally appropriate area of inquiry.

Pfannenstiel's counsel also approached the line of advocating against Pfannenstiel's position by saying, "Mr. Pfannenstiel has misunderstood some things I've told him." But counsel immediately followed that statement by arguing that the district court should grant Pfannenstiel's motion. Taken in context, the comment about the

misunderstandings actually supported Pfannenstiel's view that there had been a breakdown in communication between him and his attorney.

We find no basis in the record to hold that the district court abused its discretion by improperly conducting the inquiry into Pfannenstiel's claimed dissatisfaction. Pfannenstiel's arguments on this point fail.

CONCLUSION

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

BILES, J., concurring in part and dissenting in part:

I concur in the result and agree with most of the majority's analysis. I believe it lays out the appropriate analytical framework dealing with a trial court's duty to inquire when a criminal defendant expresses dissatisfaction with court-appointed counsel and clarifies the caselaw, which has been less than clear-cut in my view.

I write separately only because I cannot accept the majority's perpetuation of a myth created in *State v. Prado*, 299 Kan. 1251, 329 P.3d 473 (2014), that Prado's attorney "went beyond facts, expressed a personal opinion about the merits of Prado's claim, and explicitly advocated against Prado's interest." Slip op. at 24 (quoting *Prado*, 299 Kan. at 1259).

26

I explained my disagreement with that characterization at the time. See *Prado*, 299 Kan. at 1265-66 (Biles, J., dissenting). Normally, that would be enough. But I fear the majority's continued mischaracterization of what Prado's attorney said will cause conscientious counsel to scratch their heads in bewilderment given the majority's warning today that "counsel must carefully provide only a factual recitation and not shift to advocating against the defendant's position." Slip op., Syl. ¶ 9. Put simply, diligent counsel cannot be blamed for not understanding where the lines are drawn, especially when these situations often arise at the spur of the moment.

In *Prado*, this is all that defense counsel said to draw a foul:

> "'[DEFENSE COUNSEL]: Judge, here's my problem. It's in the Complaint. As best I can understand Mr. Prado, he is trying to articulate that he did not understand what was going on. We've had extensive discussions. I didn't file a motion to withdraw based on conflict because I didn't see a conflict. The problem is, it appears to me, although maybe he hasn't articulated it very clearly, he is at least implicating that he has not been counseled, didn't understand what occurred regarding the plea.'" *Prado*, 299 Kan. at 1255.

To my eyes, this is nothing more than a factual recitation to a court about what had happened previously. Prado's attorney did not express a contemporaneous opinion about the merits of what was being presented that day for the court's consideration; he simply explained why he had not moved to withdraw on his own before the hearing.

In Pfannenstiel's case, the majority brushes aside as insignificant defense counsel's factual recitations about what she did to contact witnesses, conduct discovery, and share evidence with Pfannenstiel as "merely" reporting her actions, even though they directly contradicted Pfannenstiel's allegations. Slip op. at 14. This alone illustrates inconsistency

27

between today's opinion and *Prado*. These factual recitations are akin to Prado's counsel explaining that he had "'extensive discussions'" with Prado. But while such statements are insignificant to today's majority, they were a basis for the *Prado* majority's conclusion that counsel improperly advocated against Prado. See 299 Kan. at 1259.

Later in today's opinion, the majority says defense counsel approached "the line of advocating against Pfannenstiel's position" but ultimately concludes it was not crossed while offering an evaluation of her own trial strategy and by claiming Pfannenstiel had misunderstood "some things" she had told him. Slip op. at 25. But let's be more precise. When the district court asked defense counsel if she had contacted any of the witnesses at issue, she responded:

"I contacted Keith Jacobs (sic) and Lydell Frye, Judge. Eugene, last name unknown, no one could provide me with his last name. I did attempt to call him at the numbers that others had, and he never returned my calls, and couldn't leave messages on his cell phone. Those witnesses that I was able to talk to, their testimony–their statements, their recollections, of that evening differed from each other, and they differed from Mr. Pfannenstiel's. And I have told him that several times. So they were not able to confirm his–his beliefs of what they would be able to. And because their testimony, or their statements, were so in opposition to each other, I did not believe that they would be of any use to us at trial and might undermine his testimony."

Later, the district court asked if defense counsel had sent a copy of the evidence to the defendant. She replied:

"I believe I did, Judge. It would have been in the earlier portion. I never send all of the statistical. And it's my practice to read all of my clients the narrative portion of the police reports. What Mr. Pfannenstiel might be referring to is pictures and tapes that were provided to me on a CD. Now, those, I think we had some copies, but I did not show him

28

DVD or CD's, whatever you want–the pictures. That might be what he's referring to. But he received copies of the DNA test, the lab reports from that. Tried to send him everything."

Later still, the judge asked whether defense counsel had any concluding response after hearing all of the allegations. She responded:

"Well, Judge, obviously I think Mr. Pfannenstiel has misunderstood some things I've told him, but I think the most important thing here is that we're at a crucial stage and that is sentencing. Obviously, from all of his concerns, I don't expect that he's going to believe that I'm handling sentencing. And he is a border box, Judge. We did discuss everything yesterday about that, and we did send him a letter. But in view of his serious apprehensions about my representation, I believe that perhaps it would be best to get another attorney to look at sentencing and maybe be able to work with him on–on that."

In those places in these exchanges where the majority perceives defense counsel was dangerously close to its "line," the majority excuses what happened because (1) witness trial strategy is left to the professional judgment of the attorney; and (2) counsel redeemed herself ultimately by supporting appointment of new counsel. Slip op. at 25. But like counsel's evaluative statements about trial strategy in this case, Prado's counsel's statement that he "'didn't see a conflict'" also merely expressed an independent professional judgment about whether he had perceived prior to the hearing any duty to withdraw based on his relationship with his client. *Prado*, 299 Kan. at 1255; see also Kansas Rules of Professional Conduct 1.16 (2014 Kan. Ct. R. Annot. 583-84) (declining or terminating representation). And as noted above, this statement was far from an averment that no conflict existed at the time of the hearing. Added to that, Prado's counsel was not actually addressing a motion to appoint new counsel or, for that matter, any motion at all. Rather, the inquiry in *Prado* commenced after Prado simply blurted out at sentencing, "'My attorney has not explained things properly to me.'" 299 Kan. at 1253.

My point in all of this is not to broadly challenge the majority's opinion today. I agree with it, and it will be rightly cited by appellate courts as the appropriate manner to review these claims. But I also think its methods and rationale apply equally to *Prado*. The majority does a disservice to the practitioner, who must discern where these lines get drawn, by prolonging the *Prado* myth.

ROSEN, J., joins the foregoing concurring and dissenting opinion.