IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,853

STATE OF KANSAS,
*Appellee*,

v.

STEVEN M.N. LOUIS,
*Appellant.*

SYLLABUS BY THE COURT

1.

When analyzing jury instruction issues, we follow a three-step process: (a) Determining whether an appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (b) considering the claim's merits to determine whether error occurred; and (c) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If the error did not violate a constitutional right, the error is reversible only if the court determines there is a reasonable probability the error affected the outcome of the trial in light of the entire record.

2.

Kansas does not recognize the crime of attempted involuntary manslaughter.

3.

The double rule of K.S.A. 2011 Supp. 21-6819(b) does not apply to off-grid sentences. Subsection (b)(2) provides that when grid and off-grid sentences run

1

consecutively, an offender serves the off-grid sentence before service of the grid sentence commences. Because the primary crime cannot be an off-grid crime, the double rule applies to the grid crimes after the defendant serves the off-grid sentence and does not limit the off-grid sentence.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed November 23, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and *Lydia Krebs*, of the same office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: This is Steven M.N. Louis' direct appeal from his convictions for first-degree felony murder, three counts of attempted first-degree murder, and additional counts of aggravated assault and criminal discharge of a firearm. His convictions arise from a clash between two rival Wichita gangs that included a shoot-out in a local restaurant's parking lot and a later drive-by shooting in a residential neighborhood. Louis challenges the convictions and the life sentence he received for the murder conviction.

Regarding the convictions, Louis argues: (1) The district court erred when it failed to give lesser included offense instructions relating to the attempted first-degree murder convictions; (2) the district court erred when it failed to instruct that a principal cannot be liable under the felony-murder statute for the death of a co-felon arising from a third-party's lawful self-defense; and (3) the prosecutor improperly commented during closing arguments that Louis did not want the jury to know he and others involved in the shootings were gang members. As to the sentencing, he contends the district court could

not impose the life sentence because statutory sentencing guidelines for multiple conviction cases limited his total prison term to twice the sentence authorized for his most serious conviction that was not eligible for a life sentence. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The first shooting occurred at a restaurant where Louis was present with several companions, including Michael Saechao, who died in the gunfire. Louis, Saechao, and others in Louis' party belonged to a street gang known as the "Asian Boyz." John and Daniel Nguyen, Hien Dao, and Hau Tran, who were members of a rival gang known as the "Viet Boyz," were also there, along with their friends, Viet Nguyen and Jennifer Ma. The State claimed there had been an earlier altercation between members of the two groups that extended to the restaurant.

The testimony about the first shooting and the moments leading up to it varies. Most witnesses—including everyone who claimed to see the shooting itself—were members of one group or the other. Multiple witnesses recalled a disturbance inside the restaurant, after which an employee ejected the Viet Boyz group. One witness testified Tran then made faces through the window at Louis and his group. After this, Louis and his party's other male members, including Saechao, left through the back exit. Gunfire erupted after Louis left the restaurant.

Police recovered numerous cartridge casings. The evidence shows all the shots were fired by two people: a passenger in a gray or silver Honda SUV, in which the Viet Boyz group was leaving, and Louis, who was on foot. There was conflicting testimony about who fired first. One witness said the gunfire started while the Viet Boyz group was running to their vehicle. When the gunfire started, she looked up and saw Louis shooting, although she was not certain who fired first. Another witness said three or four shots came from the SUV and no shots were fired thereafter. And yet another said she walked

3

out, the gunfire began, and she saw an individual running up from the side of the building and shooting as the SUV drove away. One of the SUV's passengers said he heard gunshots coming from behind the vehicle before he was struck in the back by a bullet and passed out.

Louis, on the other hand, claimed he left through the back exit to be with Saechao, who was smoking a cigarette. He said he was walking to his car when gunfire started and someone said "duck" or "run." He said he saw movement and a gun inside the SUV. He admitted firing a full 15-round clip at the SUV but argued it was self-defense.

In the aftermath, Saechao had sustained a fatal gunshot wound to the head. Viet Nguyen and John had each suffered gunshot wounds to their backs. Louis admitted leaving the scene within a couple of seconds. He was driving a dark, multi-colored hatchback with a white hood and a loud exhaust.

Meanwhile, the Viet Boyz group in the SUV and their companions travelling in different vehicles drove to a residential area where yet another companion of the group lived. About 20 minutes later, gunshots fired from a passing car struck two homes, two unoccupied vehicles, and Dao's vehicle, in which Ma had just arrived. Ma was still in the driver's seat when the bullets struck the car: one through the windshield and into the dashboard right above the steering wheel, one through the driver's side mirror and driver's side window, and one just behind the driver's side door.

Ma did not see the shooter but told detectives one of two cars she saw was black and white, possibly a hatchback. An area resident saw a dark hatchback with a "distinctive" muffler sound coming up the road after hearing gunshots. Another said he heard a car leaving at a high speed that sounded like a foreign car with a big muffler. Police again collected cartridge casings from the scene, all of which were ejected from the same weapon as 15 casings recovered from the restaurant parking lot.

4

Police found Louis' vehicle the next day at the house where Louis had been staying. The car was in the garage under a tarp and had a bullet hole in its roof.

The State put on evidence about tension between the Asian Boyz and Viet Boyz gangs arising from a 2009 altercation, in which a Viet Boyz member had been killed. At the time of the shootings in this case, an Asian Boyz member had recently been sentenced for a crime related to that 2009 incident.

The jury found Louis guilty of 12 crimes. Those relevant to this appeal are: the first-degree felony murder of Saechao; the attempted first-degree murder of Ma; and the attempted first-degree murders of SUV passengers, Dao and John Nguyen.

The district court sentenced Louis to a hard 20 life sentence for felony murder and a consecutive 165-month prison term for Ma's attempted first-degree murder. It directed the sentences for the remaining 10 counts to run concurrent to the others.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Louis requested a jury instruction on attempted second-degree murder as a lesser included offense for Ma's attempted first-degree murder. The State objected, arguing the evidence supported only the single conclusion that Louis went to the residential area to shoot anyone there. The district court refused the requested instruction, explaining:

"Moving from the . . . restaurant to [the residential area], the very act of moving there is a premeditated act and the firing at the vehicle, discharging the firearm into this vehicle is a premeditated act.

"Jennifer Ma was present. And again, the trajectory of the three bullets that entered that vehicle, clearly it could be argued—obviously, the jury has to make the

5

conclusion, but it can clearly be argued that those three rounds were intended to kill somebody in the . . . driver's seat of that vehicle.

"So based on those factors and the argument made by [the State], it is just a different way of saying I think somewhat the same thing, I will not give the lesser included instruction . . . ."

As to the attempted first-degree murders of Dao and John Nguyen at the restaurant, the district court instructed the jury on the lesser included offenses of attempted second-degree murder and attempted voluntary manslaughter. But the district court refused Louis' request to instruct the jury on attempted involuntary manslaughter as a lesser included offense. Louis argued the instruction was warranted because he acted recklessly when he ran "down the barrel of a gun being fired at" him. The district court ruled that the act of pulling a trigger could not be involuntary.

On appeal, Louis claims the district court erred by refusing to give the requested instructions.

*Standard of review*

When analyzing jury instruction issues, an appellate court follows a three-step process by: (1) Determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred; and (3) assessing whether the error requires reversal. *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). Whether a party has preserved a jury instruction issue affects the reversibility inquiry at the third step. 302 Kan. at 752; see also K.S.A. 2015 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). Louis requested the instructions

at issue here, so he preserved the issue. See K.S.A. 2015 Supp. 22-3414(3) (defendant must distinctly state an objection to the omission of an instruction before the jury retires to consider its verdict).

At the second step, we consider whether the instruction was legally and factually appropriate, employing an unlimited review of the entire record. *Pfannenstiel*, 302 Kan. at 752. If the district court erred, and the error did not violate a constitutional right, "the error is reversible only if [the court] determine[s] that there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012) (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]).

*Lesser included offense of attempted first-degree murder of Ma*

An attempted intentional second-degree murder instruction would have been legally appropriate as a lesser included offense of attempted first-degree murder. See *State v. Shannon*, 258 Kan. 425, 429, 905 P.2d 649 (1995) (noting intentional second-degree murder is lesser included offense of first-degree murder and court has previously recognized attempted second-degree murder as lesser included offense of attempted first-degree murder); see also K.S.A. 2015 Supp. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to . . . any such lesser included crime."). Therefore, the only remaining issues are whether the instruction was factually appropriate and, if so, whether failing to give it was reversible.

Attempted intentional second-degree murder differs from attempted first-degree murder in that the former lacks the element of premeditation. See *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012) (noting premeditation element is only difference between first-degree premeditated murder and second-degree intentional murder); see

7

also *State v. Clark*, 261 Kan. 460, 466-67, 931 P.2d 664 (1997) (jury instruction on lesser included offense of attempted second-degree murder not warranted because of evidence establishing premeditation). Compare K.S.A. 2015 Supp. 21-5402(a)(1) (first-degree premeditated murder), with K.S.A. 2015 Supp. 21-5403(a)(1) (second-degree intentional murder). The State argues Louis was not entitled to this instruction because the jury could not reasonably have convicted him of attempted second-degree murder given the abundant evidence of premeditation for the drive-by shooting.

This issue raises two questions. First, when all the elements of a lesser included offense are identical to some elements of the charged offense, is a defendant entitled to a jury instruction on the lesser offense because evidence sufficient to sustain a conviction on the greater offense is necessarily sufficient to sustain a conviction on the lesser? And, second, if not, was Louis entitled to an instruction on attempted second-degree murder based on the evidence at trial?

We note an apparent conflict in our recent cases on the first question. Compare *Haberlein*, 296 Kan. at 204 (holding in first-degree premeditated murder case that jury instruction on lesser included offense of intentional second-degree murder was factually appropriate because elements other than premeditation identical so jury could have convicted of lesser crime without danger of reversal for insufficient evidence), with *State v. Jones*, 279 Kan. 395, 401-06, 109 P.3d 1158 (2005) (reviewing strength of evidence supporting both premeditation and mere intentional conduct in determining whether lesser included offense instruction appropriate). But we need not resolve this because even assuming the district court should have given the instruction, its failure to do so was harmless. There was overwhelming evidence of premeditation, so there is no reasonable probability the jury would have convicted Louis of second-degree murder had the instruction been given.

"Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). But the design or intent to kill must have been formed before the act; premeditation requires more than an instantaneous, intentional killing. See *State v. Lawrence*, 281 Kan. 1081, 1090-91, 135 P.3d 1211 (2006) (reciting definition of premeditation in pattern instructions and listing cases approving language used therein). Factors used to determine whether evidence raises an inference of premeditation include:

> "'(1) [T]he nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]' *Scaife,* 286 Kan. at 617-18; see *State v. Marks,* 297 Kan. 131, 140, 298 P.3d 1102 (2013). But the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation." *Kettler*, 299 Kan. at 467.

When the defendant kills someone other than the intended victim, intent and premeditation are transferred to the killing of the unintended victim. *State v. Gayden*, 259 Kan. 69, 77, 910 P.2d 826 (1996).

Using a deadly weapon, Louis fired multiple shots into the driver's area of Ma's vehicle, where Ma was sitting. There was no evidence that Ma provoked Louis to indicate he instantaneously formed the intent to kill her—the incident at the restaurant occurred approximately 20 minutes earlier. Louis witnessed his friend suffering a fatal gunshot wound to the head during the restaurant shootout with individuals who happened to have driven directly to the residence where Ma's vehicle was parked. Moreover, Ma's vehicle belonged to one of those individuals. And because Louis fired all the rounds from his weapon at the restaurant, he necessarily had to reload before the drive-by shooting. Then,

he sped from the scene and the vehicle he used to commit the crime was found concealed in a garage under a tarp.

In view of this evidence that Louis formed a design or intent to kill before the drive-by shooting, there is no reasonable probability the jury would have convicted him of attempted second-degree murder had the instruction been given.

*Lesser included offense of attempted involuntary manslaughter*

Louis also argues his convictions for attempted first-degree murder for the shootings outside the restaurant must be reversed because the district court should have instructed the jury on the lesser included offense of attempted reckless involuntary manslaughter. We disagree. Attempted involuntary manslaughter is not an offense, so the requested instruction was not legally appropriate.

An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof . . . ." K.S.A. 2015 Supp. 21-5301(a). To prove an attempt, the State "must show . . . the actual intent to commit [the] particular crime." *State v. Robinson*, 256 Kan. 133, 137, 883 P.2d 764 (1994).

K.S.A. 2015 Supp. 21-5405(a)(1) defines involuntary manslaughter as "the killing of a human being committed . . . [r]ecklessly." K.S.A. 2015 Supp. 21-5202(j) provides: "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk . . . that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." The defendant's conduct must be voluntary. K.S.A. 2015 Supp. 21-5201(a); see also K.S.A. 2015 Supp. 21-5202(a) (culpable mental state is element of every crime, except where otherwise provided, which must be proved by either

10

intentional, knowing, or reckless conduct). But specific intent to kill is not an element of the offense. See K.S.A. 2015 Supp. 21-5202(h) (crimes defined with intent state of mind are specific intent crimes).

Kansas has previously refused to recognize the offense of attempted involuntary manslaughter. See *Shannon*, 258 Kan. at 428-29; *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 (1995). The rationale is that an attempt requires specific intent to commit the object crime, so "to establish the crime of attempted involuntary manslaughter the person would be required to specifically intend to commit an unintentional crime. This is a logical impossibility." *Collins*, 257 Kan. at 419; see also *Robinson*, 256 Kan. at 137 (attempted first-degree felony murder is not a crime because, among other things, felony murder allows for a culpable mental state short of specific intent to kill, *i.e.*, recklessness, negligence, or an accident, and one cannot intend to commit accidental, negligent, or reckless homicide).

Louis argues the 2011 recodification of the Kansas criminal statutes changes the analysis because, under the new code, proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. He reasons that if recklessness suffices to establish an element, that element is also established if a person acts knowingly or intentionally. Therefore, he argues, when the facts are sufficient to prove a defendant attempted to intentionally kill another with premeditation, they are also sufficient to prove attempted reckless involuntary manslaughter.

The new statutory language does not aid Louis because reckless involuntary manslaughter does not require intent to kill as an element of the offense. Conduct designed to cause death—and, for that matter, conduct the actor knows is reasonably certain to cause death—is now sufficient to establish the defendant acted recklessly. See K.S.A. 2015 Supp. 21-5202(c), (h), and (i). But a person who intends to kill and fails is guilty of an attempted intentional killing. See 2 LaFave, Substantive Criminal Law § 11.3

11

(2d ed. 2003) ("[T]here is no such thing as attempted second degree murder in those jurisdictions where the types of malice sufficient for second degree murder do not include intent to kill."); see, *e.g.*, *State v. Coble*, 351 N.C. 448, 449-51, 527 S.E.2d 45 (2000) (under state law, first-degree murder is only homicide crime that requires intent to kill; because other homicide crimes lack this element, and attempt requires specific intent to complete the underlying offense, attempt to commit any form of homicide other than first-degree murder logically impossible); *Dominguez v. State*, 840 N.W.2d 596, 603 (N.D. 2013) (holding attempted murder requires specific intent to kill, therefore attempt to commit murder under circumstances manifesting extreme indifference to the value of human life, resulting in an unintentional death, is not a cognizable offense).

Because attempted involuntary manslaughter is not a recognized criminal offense, the requested instruction for the attempted first-degree murders of Hien Dao and John Nguyen was not legally appropriate.

FELONY-MURDER INSTRUCTION

Louis next argues the district court erred by failing to instruct the jury that felony murder does not occur when a co-felon's death results from a third party's legal act of self-defense. Louis did not request this instruction at trial, so the trial court's failure to give it would be reviewed for clear error if the instruction was legally and factually appropriate. *Pfannenstiel*, 302 Kan. at 752-53. Any error is not reversible unless the court is firmly convinced that error affected the jury's verdict. See 302 Kan. at 752-53.

A defendant is not criminally responsible for a co-felon's death caused by a law enforcement officer's lawful acts or by the felony victim's self-defense. *State v. Sophophone*, 270 Kan. 703, 713, 19 P.3d 70 (2001) (law enforcement officer's lawful act); *State v. Murphy*, 270 Kan. 804, 809, 19 P.3d 80 (2001) (victim's self-defense). Here those circumstances were not presented. There is no evidence showing Saechao was

12

engaged in a felony enterprise with Louis when he died. Instead, the only evidence was Louis' testimony that Saechao was smoking a cigarette behind the restaurant when the shooting occurred. All the physical evidence showed the rounds fired by the Asian Boyz group were from a single gun, and Louis admitted he was the shooter.

Based on the record, the jury could not have inferred Saechao was Louis' co-felon, so an instruction on this otherwise valid legal principle was not factually appropriate.

ALLEGED PROSECUTORIAL ERROR

Louis next argues the prosecutor committed reversible error during his rebuttal to defense counsel's closing argument by commenting on the district court's evidentiary rulings. The statement at issue followed defense counsel twice referring to evidence of Louis' gang affiliation as "baloney." This apparently prompted the prosecutor to respond:

> "And what do ya know, this defendant loads up. He testified under oath that he loaded up his gun in his pants and went into [the restaurant]. Why? Why go into [the restaurant] with a gun that has 15 rounds in it? Because you're going in there because you know your rivals are there. Gang stuff baloney? They want to believe it's baloney, *they don't want you to know anything about it*. But you do know something about it, ladies and gentlemen, you know [Louis] self-admitted to [a Sheriff's deputy]. And they want you to say oh, you can't believe [the deputy.]" (Emphasis added.)

*Standard of review*

We recently retooled how we will consider a criminal defendant's challenge to a prosecutor's behavior during trial. See *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). *Sherman* distinguishes between prosecutorial conduct that is merely negligent or careless and prosecutorial behavior that is intentional or in some way malicious. See 305 Kan. at 114. In the context of closing argument, either can lead to error if the prosecutor

13

goes outside the wide latitude allowed when discussing evidence. If so, the court evaluates "whether the error prejudiced the defendant's due process rights to a fair trial" by applying the federal constitutional harmless error inquiry articulated in *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109; see *State v. Carter*, 305 Kan. 139, 148, 380 P.3d 189 (2016).

But because Louis' case was argued and fully submitted prior to *Sherman*, and because applying *Sherman* would not change the outcome, we will use our prior prosecutorial misconduct caselaw. See *Carter*, 305 Kan. at 148 (applying prior caselaw when the case was argued and fully submitted for the court's decision prior to *Sherman* and "application of the new framework would not make a difference in the outcome"). And under that previous caselaw, review based on a prosecutor's improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude allowed to a prosecutor, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Hudgins*, 301 Kan. 629, 646, 346 P.3d 1062 (2015).

"Appellate courts consider three factors in analyzing the second step: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman* . . . have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

"When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the

14

constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. [Citation omitted.] Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. [Citation omitted.]" *Hudgins*, 301 Kan. at 646-47.

*Discussion*

Louis relies on *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002), to argue the prosecutor's statement was misconduct. In *Finley*, the court held the prosecutor exceeded the wide latitude allowed in discussing evidence when he told the jury, "'[E]very time that the defendant objected to the admission of their evidence, you noticed that it was overruled because there's no basis in law for that objection. They didn't do anything wrong.'" 273 Kan. at 248. The court reasoned:

"It is a well established law in this state that rulings of the trial court on objections to evidence are not a proper subject for a prosecutor's closing argument. Why any prosecutor would conclude otherwise and mention such rulings in closing argument to bolster its case before the jury is beyond any good answer. When the law is so clear we cannot understand why such errors occur." 273 Kan. at 248.

Louis claims the prosecutor in his case similarly discussed defense counsel's attempts to exclude evidence of Louis' gang affiliation. But he does not identify any instance of an objection to gang evidence that was ruled upon in the jury's presence, such that the jury would have understood the prosecutor's rebuttal comment to have referred to any such ruling. So unlike the comment in *Finley*, which explicitly traded on defense counsel's lack of success when objecting to the State's evidence, it is uncertain whether the comment here was actually a comment on a trial court ruling, as Louis asserts.

15

But even absent reference to a particular ruling, it is unclear how the defense's desire to keep evidence from the jury would be a proper factor in the jury's decision-making to justify the prosecutor's comment. In other words, this information would not be relevant to deciding guilt for the charged crimes. *Cf. State v. Knox*, 301 Kan. 671, 684, 347 P.3d 656 (2015) (misconduct for prosecutor to comment about defense counsel's experience because the statement relied on facts outside the evidence).

Nonetheless, absent any other context and given that this was a single comment made in rebuttal, we hold this statement was within the wide latitude afforded to prosecutors when responding to defense counsel's "baloney" remark—but just barely. See *State v. Wells*, 297 Kan. 741, 753, 305 P.3d 568 (2013) ("The line of separation is a thin one; were it drawn with chalk, the prosecutor's shoes would need buffing.").

MULTIPLE OFFENSES SENTENCING

Finally, Louis argues his sentence is illegal based on his reading of K.S.A. 2011 Supp. 21-6819(b)(4), which provides: "The total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence."

Louis claims his life sentence for the felony-murder conviction violates the statute's so-called "double rule" because the base sentence for his primary crime was 165 months' imprisonment under the statute. If true, he reasons that the longest prison sentence the district court could have imposed was 330 months.

This claim arises for the first time on appeal. But an appellate court may correct an illegal sentence at any time. *State v. Kelly*, 298 Kan. 965, 975, 318 P.3d 987 (2014) (citing K.S.A. 22-3504[1]). We consider this argument on that basis.

16

*Standard of review*

The issue is whether the above-quoted language from K.S.A. 2011 Supp. 21-6819(b)(4) applies to the off-grid portion of a defendant's prison sentence. This requires interpretation of K.S.A. 2011 Supp. 21-6819. Interpretation of a sentencing statute is a legal question over which an appellate court has unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

*Discussion*

In cases in which consecutive sentences may be imposed, the sentencing court is governed by the following statutory language:

"(1) When the sentencing judge imposes multiple sentences consecutively, the consecutive sentences shall consist of an imprisonment term which is the sum of the consecutive imprisonment terms, and a supervision term. The postrelease supervision term will be based on the longest supervision term imposed for any of the crimes.

"(2) The sentencing judge shall establish a base sentence for the primary crime. The primary crime is the crime with the highest crime severity ranking. *An off-grid crime shall not be used as the primary crime in determining the base sentence when imposing multiple sentences. If sentences for off-grid and on-grid convictions are ordered to run consecutively, the offender shall not begin to serve the on-grid sentence until paroled from the off-grid sentence, and the postrelease supervision term will be based on the off-grid crime.* If more than one crime of conviction is classified in the same crime category, the sentencing judge shall designate which crime will serve as the primary crime. In the instance of sentencing with both the drug grid and the nondrug grid and simultaneously having a presumption of imprisonment and probation, the sentencing judge shall use the crime which presumes imprisonment as the primary crime. In the instance of sentencing with both the drug grid and the nondrug grid and simultaneously having a presumption of either both probation or both imprisonment, the sentencing judge shall use the crime with the longest sentence term as the primary crime.

17

"(3) The base sentence is set using the total criminal history score assigned.

"(4) The total prison sentence imposed in a case involving multiple convictions arising from multiple counts within an information, complaint or indictment cannot exceed twice the base sentence. This limit shall apply only to the total sentence, and it shall not be necessary to reduce the duration of any of the nonbase sentences imposed to be served consecutively to the base sentence. The postrelease supervision term will reflect only the longest such term assigned to any of the crimes for which consecutive sentences are imposed. Supervision periods shall not be aggregated.

"(5) Nonbase sentences shall not have criminal history scores applied, as calculated in the criminal history I column of the grid, but base sentences shall have the full criminal history score assigned. In the event a conviction designated as the primary crime in a multiple conviction case is reversed on appeal, the appellate court shall remand the multiple conviction case for resentencing. Upon resentencing, if the case remains a multiple conviction case the court shall follow all of the provisions of this section concerning the sentencing of multiple conviction cases.

"(6) If the sentence for the primary crime is a prison term, the entire imprisonment term of the consecutive sentences will be served in prison.

"(7) If the sentence for the consecutive sentences is a prison term, the postrelease supervision term is a term of postrelease supervision as established for the primary crime.

"(8) If the sentence for the primary crime is a nonprison sentence, a nonprison term will be imposed for each crime conviction, but the nonprison terms shall not be aggregated or served consecutively even though the underlying prison sentences have been ordered to be served consecutively. Upon revocation of the nonprison sentence, the offender shall serve the prison sentences consecutively as provided in this section." (Emphasis added.) K.S.A. 2011 Supp. 21-6819(b).

Louis' reading of the statute is without merit. The legislature could not have meant the portion of K.S.A. 2011 Supp. 21-6819 upon which he focuses to limit the total prison

term for off-grid crimes to twice the sentence for any grid-felony conviction also entered in a multiple conviction case. The statute clearly contemplates on-grid and off-grid sentences may be imposed in the same case. See K.S.A. 2011 Supp. 21-6819(b)(2). Moreover, under the Revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2011 Supp. 21-6801 *et seq.*, felony murder is an off-grid crime for sentencing purposes for which "the sentence shall be imprisonment for life . . . ." K.S.A. 2011 Supp. 21-6806(c). Conspicuously, K.S.A. 2011 Supp. 21-6819 is absent from the list of statutory exceptions to the mandatory-life-sentence requirement. See K.S.A. 2011 Supp. 21-6806(c).

We further note that a Court of Appeals panel has recently rejected an identical legal argument under similar facts employing a similar rationale. *State v. Grotton*, 50 Kan. App. 2d 1028, 337 P.3d 56 (2014), *rev. denied* 302 Kan. 1015 (2015). The *Grotton* court reasoned that (1) applying the double rule to off-grid crimes would violate the statute prescribing the hard 25 life sentence for off-grid Jessica's law offenses; and (2) applying the double rule would be absurd, because a person convicted of only an off-grid crime would serve a life sentence, but a person convicted also of a grid crime would serve only up to twice the grid sentence because the person committed an additional crime. 50 Kan. App. 2d at 1032. The court held:

"A more reasonable interpretation of K.S.A. 21-4720(b) [the predecessor to K.S.A. 2011 Supp. 21-6819] is that grid and off-grid sentences are handled separately. Section (b)(2) provides that when grid and off-grid sentences run consecutively, the offender serves the off-grid sentences first and does not begin to serve the grid sentence until paroled from the off-grid sentence. Because the primary crime cannot be an off-grid crime, the double rule applies to the grid crimes *after* the defendant serves his or her off-grid sentence and does not limit the off-grid sentences. K.S.A. 21-4720(b)(2). In cases where the sentences all run concurrent to each other—as is the case here—the grid sentence is subsumed into the off-grid sentence, and the double rule does not come into play. Under this reasonable interpretation of K.S.A. 21-4720(b), the double rule does not apply to Grotton's off-grid sentences, and her total sentence was not illegal." 50 Kan. App. 2d at 1033.

19

We agree with this reasoning and hold that Louis' life sentence is not illegal.

Affirmed.