IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,223

STATE OF KANSAS,
*Appellee*,

v.

DARNELL D. COLEMAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

Premeditation includes both a temporal element (time) and a cognitive element (consideration). A prosecutor thus commits error during closing arguments by making statements that contradict or obfuscate the cognitive aspect of premeditation by saying premeditation only requires time.

2.

Prosecutors err by arguing facts not in evidence.

3.

Under the facts presented, a prosecutor did not err by downplaying a theory of defense because the prosecutor acknowledged there is conflicting evidence and merely presented a path for resolving the conflict that favors the State's theory of the case.

4.

Under the facts, a prosecutor's use of "we don't know" when discussing inconclusive evidence was not error and was not an expression of the prosecutor's opinion.

1

5.

To avoid reversible prosecutorial error, the State must demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial considering the entire record, i.e., that there is no reasonable possibility that the error contributed to the verdict.

6.

When jury instructions properly and fairly state the law and are not reasonably likely to mislead the jury, no error exists. It is immaterial whether another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been more clear or more thorough than the one given.

7.

A defendant has a right under the Sixth Amendment to the United States Constitution to effective assistance of counsel. Effective assistance includes a right to representation unimpaired by conflicts of interest or divided loyalties but, in situations with appointed counsel, it does not include the right to counsel of the defendant's choosing. When a defendant articulates dissatisfaction with counsel, the trial judge has a duty to inquire. Dissatisfaction can be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.

8.

Appellate courts analyzing a claim of cumulative error consider the errors in context, the way the trial judge addressed the errors, the nature and number of errors and whether they are connected, and the strength of the evidence. If any of the errors being aggregated are constitutional, the constitutional harmless error test from *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), applies. Under that

test, the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome.

Appeal from Sedgwick District Court; TYLER J. ROUSH, judge. Oral argument held May 15, 2023. Opinion filed February 16, 2024. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris Kobach*, attorney general, were on the brief with him for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: Darnell D. Coleman appeals his conviction of first-degree premeditated murder. Coleman asserts:

(1) The prosecutor who presented the State's initial closing argument and a second prosecutor who presented an argument rebutting Coleman's closing erred by making incorrect statements of law and fact about premeditation.

(2) The district court committed clear error by failing to give a modified jury instruction on premeditation approved by this court in *State v. Bernhardt*, 304 Kan. 460, 372 P.3d 1161 (2016), and *State v. Stanley*, 312 Kan. 557, 478 P.3d 324 (2020).

(3) The district court erred by failing to remove his trial counsel after a complete breakdown in communication.

(4) And cumulative error deprived him of a fair trial.

We reject most of Coleman's claims but hold the prosecutors erred during closing argument. But prosecutorial error alone does not mandate reversal. Instead, we must consider the errors, individually and cumulatively, in the context of all closing arguments, the instructions, and the evidence and analyze whether the prosecutorial errors affected the jury verdict. After doing so, we conclude beyond a reasonable doubt that the prosecutorial errors did not affect the verdict, and we affirm Coleman's conviction.

## FACTS AND PROCEDURAL BACKGROUND

In October 2017, the Sedgwick County Sheriff's Office responded to a call reporting a body found near railroad tracks in a remote, rural area. Officials determined Tamsen Kayzer was the victim.

Kayzer and Coleman had been in a long-term on-again-off-again, non-monogamous relationship. Kayzer's two daughters described the relationship as abusive, toxic, and lacking in trust. One daughter told the jury that Coleman would "put his hands on [her mother] from time to time," although she was not asked to explain what that meant. The other daughter, when asked if she had ever observed Coleman become violent toward her mother, replied, "Yes." She also testified that her mother told her Coleman had been physically violent. One daughter testified that Coleman kept guns in a closet. She also reported seeing Coleman wearing a revolver in his waistband near the time her mother died.

The day before Kayzer's body was found, Kayzer used Facebook to arrange a sexual encounter with someone other than Coleman. Coleman had access to Kayzer's social media accounts and monitored her communications with others, which Kayzer knew. Coleman confronted Kayzer in Facebook messages about having sex with someone, which Kayzer denied.

4

Around 10 p.m. that same night, Kayzer went to the home of one of her daughters. Coleman showed up soon after. According to Kayzer's daughter, Coleman seemed angry and asked whether Kayzer was "done now, are you finished now." Kayzer replied by asking what he was talking about. Coleman stared at her and left. About 15 minutes later, Coleman returned and asked if Kayzer was coming over to his house. Kayzer's daughter interjected that Kayzer had agreed to take her granddaughter to Kayzer's sister's house, where Kayzer lived, to spend the night. Coleman drove off like he was mad. Kayzer's daughter suspected her mother texted Coleman. After a while, Kayzer grabbed her cigarettes and phone and stepped outside. Her daughter was "pretty positive" her mother left with Coleman, and she estimated the time to be around 11 p.m. Security footage from a nearby apartment building showed Coleman and Kayzer getting into a Chevrolet Suburban around that time. About an hour and a half later, a passing train captured video of Kayzer's corpse near the railroad tracks.

Kayzer suffered five bullet wounds, three in or near her chest and two to the face. Stippling on her clothing and body suggested Kayzer was shot at close range. The crime scene investigator believed Kayzer was first shot twice in the face and later in the chest, but the coroner could not determine the order in which the wounds occurred.

Evidence collected from the scene included Kayzer's phone and a piece of mail addressed to Coleman's daughter. No bullet casings were found, suggesting someone collected them or the killer used a revolver.

One of Kayzer's daughters identified Coleman as a potential suspect. Law enforcement went to Coleman's apartment and observed a blue Suburban with what appeared to be blood splatter. The Suburban was registered to Coleman's mother. Investigators found envelopes, mail, and other papers throughout the car. Later testing would confirm the blood on the Suburban was Kayzer's.

A search of Coleman's apartment uncovered a box of ammunition that could be fired from a revolver. The box was missing six shells.

Law enforcement searched Kayzer's phone and discovered a locally stored copy of a Facebook confrontation between Kayzer and Coleman the night she died. Someone accessed Kayzer's Facebook account after she died and deleted this conversation, but the effort failed to delete the copy stored on her phone. An internet protocol address belonging to Coleman logged into Kayzer's account after her death.

Law enforcement also pulled cell phone location data for Coleman's and Kayzer's phones. Around 11:23 p.m., Coleman's cell phone pinged to a cell phone tower located near the location officers found her body.

At Coleman's trial, the defense used the testimony of Casheena Hadley to explain the presence of Kayzer's blood on Coleman's Suburban. Hadley testified she was dating Coleman around the time of Kayzer's death. She also told the jury about an incident between her and Kayzer that happened two days before Kayzer's death. According to Hadley, the confrontation started with a verbal exchange, but it became physical. Hadley hit Kayzer in the nose and mouth. Kayzer then spat her blood towards Hadley, who was up against Coleman's Suburban. Hadley also claimed Coleman slept at her place the night Kayzer died. This testimony differed from her statement to law enforcement the day after Kayzer's death. In her out-of-court statement, she told investigators that she slept alone the night of Kayzer's death.

Coleman testified in his own defense. He recalled the fight between Hadley and Kayzer, and testified he saw blood after Hadley hit Kayzer. Moving to the night of Kayzer's death, he explained that he hosted a barbecue at his house. Around 10 or 10:30 p.m., Coleman drove his son home. Coleman then testified about a series of interactions

6

he had with Kayzer that night:  After picking up drugs for Kayzer, he picked her up and took her to his house for the barbecue. While at his house, he gave her the drugs, and she asked him for a pipe. When he said he did not have one, Kayzer asked him to take her to her sister's house so she could take a bath and get a pipe. He dropped her off, thinking she would later contact him. She did not call, nor did he.

Coleman conceded that he, and no one else, possessed his phone after he drove Kayzer to her sister's house. Coleman threw away his cell phone the morning after Kayzer died.

The State called Kayzer's sister on rebuttal. The sister was home the night Kayzer died. She was expecting Kayzer to come over with her granddaughter and stayed up until around 2 a.m. waiting. Kayzer never came.

The jury convicted Coleman of one count of first-degree premeditated murder. The district court imposed a hard 50 life sentence. Coleman timely appealed. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2022 Supp. 22-3601); K.S.A. 2022 Supp. 22-3601(b)(3) (direct appeals to Supreme Court allowed for life sentence crimes).

ANALYSIS

Coleman presents four arguments. The first two are based on errors arising from attempts to explain the meaning of premeditation to the jury. First, Coleman alleges error arising from the prosecutors' arguments about premeditation. Second, he complains the trial judge gave the standard pattern instruction on premeditation and did not expand it to include other language this court has approved. He makes this argument even though he did not ask the trial judge to give an expanded explanation. Coleman, in his third claim, contends the judge should have appointed new counsel for him because he could no

7

longer effectively communicate with his trial counsel. Fourth, Coleman argues that if the individual errors do not lead us to reverse his conviction, we must do so because cumulatively they denied him a fair trial.

At the heart of Coleman's first, second, and, to some extent, his fourth claims, is the concept of premeditation. A brief discussion of premeditation will help frame these claims.

Premeditation is "a factual element that relates to the conditions under which the culpable mental state of intent was formed." *Stanley*, 312 Kan. at 568. Those conditions include "both a temporal element (time) and a cognitive element (consideration)." 312 Kan. at 573. By this we mean that premeditation "requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." 312 Kan. at 574.

These concepts were reflected in the pattern jury instructions the trial judge gave the jury. One defined premeditation as "to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." PIK Crim. 4th 54.150 (2020 Supp.). That pattern instruction also distinguished premeditated murder from an intentional, unpremeditated murder by explaining that "[a]lthough there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." PIK Crim. 4th 54.150.

Coleman argues the prosecutors conflated the concepts of premeditation and an intentional act during their closing arguments. He also argues the judge should have expanded the jury instruction to include additional language approved in *Stanley* and *Bernhardt*, 304 Kan. 460. We turn to those arguments.

8

ISSUE 1: HARMLESS PROSECUTORIAL ERROR OCCURRED

Coleman first cites several passages from the prosecutors' closing arguments—both in the arguments of the prosecutor who presented the State's initial closing argument and in the arguments of a second prosecutor who rebutted Coleman's closing argument. He contends these passages illustrate that the prosecutors "diluted the cognitive component and implied premeditation only requires a temporal element—time to think before the act." He also argues the prosecutors, through these misstatements of law, denied him a fair trial by confusing and misleading the jury. We agree that some of the prosecutors' statements suggested the jury could find Coleman premeditated the murder simply because he had time to think about his actions, regardless of whether he did so. We thus find prosecutorial error. We conclude, however, that these errors—whether considered individually or cumulatively—do not warrant reversal of Coleman's conviction.

*Standard of Review*

In considering these claims of prosecutorial error, we apply a two-step standard of review.

First, considering a prosecutor's statements in context, appellate courts ask whether the prosecutor stepped outside the wide latitude afforded prosecutors "to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). This wide latitude extends to allow prosecutors to highlight evidence and discuss inferences reasonably drawn from that evidence. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020). But a prosecutor may not misstate the law applicable to the evidence, comment on witness credibility, or

9

shift the burden of proof to the defendant. *State v. Hilt*, 307 Kan. 112, 124, 406 P.3d 905 (2017); see *State v. Sherman*, 305 Kan. 88, Syl. ¶ 5, 108-09, 378 P.3d 1060 (2016).

If an error is found, appellate courts move to the second step of review to determine whether to reverse the defendant's convictions because of the prosecutor's error. In that review, appellate courts apply the traditional constitutional harmlessness test stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See *Sherman*, 305 Kan. at 109. Under that test, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

No objection is required to preserve the question of prosecutorial error for appellate court review. *Blevins*, 313 Kan. at 428. That said, "'the presence or absence of an objection may figure into our analysis of the alleged misconduct.'" *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]).

*Analysis*

Turning to the specifics of Coleman's arguments, we find error in three portions of the prosecutors' closing argument to the jury.

First, one prosecutor argued: "The person clearly had time to think before the first shot, after the first shot, after the second, after the third, and after the fourth, I want her to die." Second, a prosecutor argued: "You can use your common sense, your experience. Bang, when that first round goes off, the cylinder has to rotate. One would assume,

10

human nature, there's a reaction, there's a moment there. And then what happens? It's followed by two, three, four, and five." And, third, a prosecutor said:

> "Again premeditation, this isn't Hollywood. This isn't Good Fellas or whatever mafia show. The law does not require a plan. I don't know how many times defense counsel kept telling you a plan. A plan. That's not what your instructions say. That's not what it says. It does not require a plan. It doesn't have to be schemed, contrived, or anything else beforehand. . . . [Y]ou don't have to lay in wait. We heard that expression as well. It only requires time. Time to have thought the matter over beforehand. That's it. Time. Time is what it takes for premeditation. Time to think it over. Those are my words in layman's terms. That's the requirement for premeditation, ladies and gentlemen."

We agree with Coleman's contention that each of these statements was outside the wide latitude allowed in argument. Considering that premeditation includes "both a temporal element (time) and a cognitive element (consideration)," *Stanley*, 312 Kan. at 573, these statements ignore—or at least obfuscate—the cognitive aspect of premeditation. They make no mention of the principle that premeditation requires a period of thoughtful, conscious reflection and pondering. *Stanley*, 312 Kan. at 574. Instead, they imply that satisfying the temporal aspect can be enough to find premeditated murder because, according to the prosecutors, premeditation "only requires time" and "[t]ime is what it takes for premeditation."

Granted, at other points in the closing, the prosecutors referred to the need for thoughtful, conscious reflection and pondering. But the statements Coleman points to as error contradict any statements about needing conscious reflection. Instead, according to the prosecutor: "Time to have thought the matter over beforehand. That's it. Time. Time is what it takes for premeditation. Time to think it over. Those are my words in layman's terms. That's the requirement for premeditation." These words negated the concept of conscious reflection. We thus find these statements misstated the law and were error.

11

The prosecutor erred in another way when saying, "You can use your common sense, your experience. Bang, when that first round goes off, the cylinder has to rotate. One would assume, human nature, there's a reaction, there's a moment there. And then what happens? It's followed by two, three, four, and five." In this statement, the prosecutor argued facts not in evidence and beyond the common understanding of many jurors. Cf. *State v. Owens*, 314 Kan. 210, 239-40, 496 P.3d 902 (2021) (prosecutor erred by arguing facts not in evidence). The prosecutor did not point to any evidence about the time it takes for a cylinder to rotate. Instead, the prosecutor asked the jury to apply common sense and experience. But the mechanism of how a revolver functions and the time it takes for certain actions to occur are not matters of common knowledge and experience. The argument invited speculation or reliance on other jurors to fill the evidentiary gap when the State should have presented evidence if it wanted jurors to consider whether the time it takes to rotate a revolver's cylinder provided Coleman sufficient time to deliberate and change his mind or abandon an impulse.

On top of these three erroneous passages, Coleman argues the prosecutor erred by making other misstatements. Through these other statements, he contends the prosecutor implied that premeditation could be instantaneous or even formed after death. He supports his argument by comparing the prosecutor's choice of words with arguments in other cases in which we held the prosecutor made misstatements of law or fact that suggested premeditation could be "instantaneous or virtually so." *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004) (error to gesture as though firing a gun and saying that sufficed to establish premeditation); see *State v. Huddleston*, 298 Kan. 941, 953, 318 P.3d 140 (2014) (error to argue premeditation could be formed after event that caused death); *State v. Hall*, 292 Kan. 841, 850-52, 257 P.3d 272 (2011) (error to argue premeditation could have formed after the first trigger pull).

We have considered the case-specific words Coleman points to and hold none of the statements were prosecutorial errors. We read the arguments as (1) emphasizing how

12

quickly premeditation may be formed without suggesting it was instantaneous and (2) pointing to the factors that support an inference of premeditation, such as listing the actions Coleman took from bringing a gun and driving to a remote area before shooting Kayzer. These arguments track others in which we found no prosecutorial error. Cf. *State v. Moore*, 311 Kan. 1019, 1041, 469 P.3d 648 (2020) (no prosecutorial error where prosecutor listed evidence, which included defendant's statements before killing and purchase of a gun a month before killing); *State v. Brownlee*, 302 Kan. 491, 518, 354 P.3d 525 (2015) (no prosecutorial error when prosecutor "pointed out key factual intervals supported by the evidence that established premeditation").

Next, Coleman asserts the State exceeded the wide latitude afforded it by arguing the jury should reject any argument that the head shots were fired first. Because Coleman presented contrary arguments about the order of the shots and cited expert statements that supported his argument, he compares these statements to those in *State v. Watson*, 313 Kan. 170, 484 P.3d 877 (2021), where a prosecutor erroneously asked a jury to disregard a defendant's theory. *Watson* presented a distinguishable situation, however.

In *Watson*, the State argued no evidence supported a defendant's theory of defense. But the defendant's testimony provided support, and we held the prosecutor erred by failing to acknowledge the evidence. See *Watson*, 313 Kan. at 181. In contrast, here the prosecutor acknowledged conflicting evidence had been presented. Citing the evidence, the prosecutor asked the jury to conclude the evidence did not establish which shot was first. Given the prosecutor's discussion of the conflicting evidence, an argument about a path for resolving the conflict that favored the State's theory about the order of the shots did not exceed the wide latitude prosecutors are afforded.

Finally, Coleman argues the prosecutor impermissibly injected his opinion in closing argument by repeatedly saying "we don't know" which shot was fired first. We have not previously discussed whether a prosecutor errs by using the phrase "we don't know," although we have some analogous caselaw.

13

For example, we have recognized and recently reaffirmed that a prosecutor exceeds the wide latitude afforded by opining on issues for the jury, including opining on the defendant's guilt or on witness credibility. We criticized using "I think" or words of similar import as introducing the prosecutor's opinion or view, which is irrelevant to the jury's task. We have also determined a prosecutor can err by saying "we know" or using similar words because "we" includes the prosecutor and thus, depending on context, might state the prosecutor's irrelevant opinion about the evidence. See *State v. Alfaro-Valleda*, 314 Kan. 526, 538-40, 502 P.3d 66 (2022).

The use of "I think" or "we know" is not always error, however. In the cases discussing "we know," we have drawn a distinction depending on what follows the phrase. "We know" followed by a discussion of uncontroverted evidence is not prosecutorial error because no opinion is expressed. But "we know" followed by a discussion of controverted evidence does involve an expression of opinion on the strength of the evidence and thus constitutes prosecutorial error. See *Alfaro-Valleda*, 314 Kan. at 539-40.

Here, the disputed "we don't know" statement was in the context of the disputed evidence about whether the witness could determine the order of the shots and was not an expression of the prosecutor's opinion. Coleman argues the prosecutor expressed an opinion that the investigator was not credible when she testified about her belief that the murderer first fired the head shots. We disagree. The prosecutor's use of "we don't know" merely embraced the uncertainty reflected in the investigator's and the coroner's testimony. Both testified that the order of shots could not be determined with certainty. The prosecutor did not err by saying "we don't know" to describe inconclusive evidence.

We thus find only three errors, each of which disregarded the cognitive component of premeditation. Our next step is to determine whether these errors denied Coleman a

14

fair trial. To avoid reversible prosecutorial error, the State must demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., [that] there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. 88, Syl. ¶ 8.

The State here asks us to reconsider this standard. It contends the defendant should bear the burden to show plain error when the issue is not preserved by a contemporaneous objection. The State notes this is the burden applied in federal cases, and it asserts this used to be the rule in Kansas before modified in *Ward*, 292 Kan. at 568-69.

The State's reliance on federal law is misplaced because Kansas preservation requirements differ from federal preservation rules and those rules direct which party carries the burden of persuasion. The federal preservation and burden requirements cited by the State derive from Federal Rule of Criminal Procedure 52. Rule 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Rule 52(b) defines the standard when no objection is made by stating that "[a] plain error that affects substantial rights may be considered."

While Rule 52 does not explicitly define the burden of persuasion, the United States Supreme Court has held the reversibility standard in subsection (b) requires a defendant to establish that the error affected the verdict, although the Government carries the burden when an issue is preserved at trial. *United States v. Olano*, 507 U.S. 725, 734-35, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). "This burden shifting is dictated by a subtle but important difference in language between the two parts of Rule 52: While Rule 52(a) precludes error correction only if the error 'does *not* affect substantial rights' (emphasis added), Rule 52(b) authorizes no remedy unless the error *does* 'affec[t] substantial rights.'" 507 U.S. at 734-35.

The State asks us to apply *Olano*'s discussion of the plain-error standard under Federal Rule of Criminal Procedure 52(b). In doing so, the State argues this court's decision in *Ward* failed to recognize the federal court's imposition of the burden of persuasion on defendants. This argument fails to recognize that the federal courts impose the burden on defendants because of wording in Rule 52(b) that differs from the Kansas statutory language interpreted in *Ward*.

*Ward* applied K.S.A. 60-261, which is phrased like Federal Rule of Criminal Procedure 52(a). Compare K.S.A. 60-261 (requiring appellate courts to "disregard all errors and defects that do not affect any party's substantial rights") with Fed. R. Crim. Proc. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Under Rule 52(a), the Government has the burden of persuading the appellate court the error was harmless. *Olano*, 507 U.S. at 735. *Ward* itself considered a motion for mistrial raised during the trial and did not concern an unpreserved claim of error. *Ward*, 292 Kan. at 544. *Ward* is thus factually distinguishable, and it is legally distinguishable from cases applying Rule 52(b) because *Ward* interpreted language like that in Rule 52(a).

The State cites no Kansas authority for placing the burden of persuasion on the defendant. Most significantly it cites no statutory basis like Rule 52(b), although the Kansas Legislature has shifted the burden to prove harmlessness to a nonobjecting party in other situations. See, e.g., K.S.A. 2022 Supp. 22-3414(3) (clear error standard applies if party fails to object to jury instruction).

The State does make the point, however, that we have historically applied a "plain error" standard in prosecutorial error cases. But that standard differs from Rule 52(b). The federal standard requires that an error be clear or obvious at the time of a ruling and that the error affect substantial rights. Even then, relief is permissive, not mandatory. *Olano*, 507 U.S. at 734-35. In contrast, in Kansas prosecutorial error cases (then called

prosecutorial misconduct), the typical recitation of the plain-error standard had three requirements, included the *Chapman* harmless error test, and did not designate which party carried the burden of persuasion. This test was stated in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), *overruled by State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016):

> "In the second step of the two-step analysis for alleged prosecutorial misconduct the appellate court considers three factors to determine if the prosecutorial misconduct so prejudiced the jury against the defendant that a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met." 278 Kan. 83, Syl, ¶ 2.

When a decision did designate which party had the burden of showing that prosecutorial misconduct did not affect the verdict, it was the State—not the defendant—that had the burden. See *State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002) (discussing prosecutorial misconduct, applying *Chapman*'s constitutional error standard, and stating that "[a] constitutional error may be declared harmless where the State proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). *Ward* cited *Kleypas* as an example of decisions in which this court had placed the burden of persuasion on the party benefitting from an error. *Ward*, 292 Kan. at 568-69.

The significant difference between the federal test and Kansas' pre-*Sherman* prosecutorial plain error framework undercuts the State's argument that federal law supports its view. And, as *Kleypas* illustrates, our history of applying the *Chapman* test in the context of prosecutorial misconduct, now error, is not on the State's side either.

Finally, we note that the State does not discuss *Sherman*, 305 Kan. 88, which reworked the framework for analyzing prosecutorial error claims and, in doing so, imposed the burden to show harmless error on the State. Explaining the need for reworking the framework, *Sherman* discussed the *Tosh* test and other aspects of the "dizzying patchwork of harmlessness and error tests [that] has resulted in significant confusion." 305 Kan. at 110. After discussing this history, *Sherman* imposed the burden on the State to prove harmlessness. 305 Kan. at 110-11.

*Sherman*'s review of our caselaw discussed this court's long-honored recognition that an objection to prosecutorial error is not necessary. This rule derives, in part, because of the "'duty of the district courts in jury trials, to interfere in all cases of their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion.'" 305 Kan. at 101 (quoting *State v. Gutekunst*, 24 Kan. 252, 254, 1880 WL 976 [1880]). *Sherman* also discussed "the particularly unique responsibility held by those with prosecuting power." 305 Kan. at 99. To impose the burden of persuasion on the defendant would shift these duties and responsibilities to the defendant, but the State offers no justification for doing so.

After *Sherman*, we have twice rejected arguments that the standard for analyzing prosecutorial error should differ depending on whether the defendant objected at trial. See *State v. Boothby*, 310 Kan. 619, 628, 448 P.3d 416 (2019) ("We have not applied a plain error standard when reviewing claims of prosecutorial error and, in keeping with *Sherman*, we decline the State's invitation to adopt the federal plain error standard [to claims of judicial comment error] here."); *State v. Chandler*, 307 Kan. 657, 682-84, 414 P.3d 713 (2018) (rejecting State's argument that analysis of prosecutorial error should change because errors were not objected to at trial).

In summary, the State does not address *Sherman*'s reasoning or our post-*Sherman* caselaw and instead cites only federal authority based on rules that differ from those in

18

Kansas. It thus gives us little reason to change our framework for analyzing claims of prosecutorial error, and we decline to do so.

Applying our established standard, we conclude there is no reasonable possibility the three erroneous passages in the prosecutors' closing arguments contributed to the verdict. We note, as developed below, that the trial judge instructed the jury on premeditation, using a pattern instruction that informed the jury that premeditation requires the defendant "to have thought the matter over beforehand." PIK Crim. 4th 54.150. We presume the jury applied the instruction and weigh that presumption in favor of finding a prosecutor's comments harmless. See *Brown*, 316 Kan. at 170 ("Appellate courts often weigh these instructions when considering whether any prosecutorial error is harmless.").

Another consideration is the strength of the State's evidence. See 316 Kan. at 171-72. And, here, the State's evidence of premeditation was strong. In arguing how the evidence showed Coleman premeditated the murder, the State also focused on the several hours between when Coleman discovered Kayzer's liaison with another man and when Kayzer died. The State argued that Coleman began planning the murder hours before she died. He got his gun, six bullets, picked her up, drove her 15 miles into the country, got out of the car, walked around to Kayzer's door, somehow got her out of the car, then shot her five times. The State pointed to various times during the evening the plan could have been formed, discussing the Facebook exchanges, Coleman's first visit to the home of Kayzer's daughter, the nearly half hour before the second visit to the daughter's house, and the drive to a remote country road. The State also established that Coleman tried to conceal incriminating evidence after Kayzer's death by accessing Kayzer's Facebook account to delete messages and throwing away his phone. See *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 (2014) ("Kansas caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: '[1] the nature of the weapon used; [2] lack of provocation; [3] the defendant's conduct

before and after the killing; [4] threats and declarations of the defendant before and during the occurrence; and [5] the dealing of lethal blows after the deceased was felled and rendered helpless.").

We are persuaded beyond a reasonable doubt that none of the statements complained of here, when considered individually, affected the outcome of the trial. Considering the prosecutorial errors in the totality of the record, the context of the errors, the number and nature of the errors, and the strength of the evidence, we conclude beyond a reasonable doubt that no error individually affected the outcome of the trial. We will discuss the cumulative effect of the errors in our discussion of issue 4.

ISSUE 2: NO JURY INSTRUCTION ERROR

In Coleman's second issue, he argues the trial judge erred by not expanding the pattern instruction that explains premeditation. The instruction given by the judge mirrored the pattern instruction on premeditation:

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." PIK Crim. 4th 54.150.

At trial, Coleman did not object to this instruction or ask the judge to add any language to it. Now on appeal Coleman argues the judge should have included additional language that this court has approved of in two other cases—*Stanley*, 312 Kan. 557, and *Bernhardt*, 304 Kan. 460.

In *Bernhardt*, the earlier of these two decisions, both the State and the defendant requested additional language. The trial judge included language Anson Bernhardt requested that focused on the cognitive aspect of premeditation: "'Premeditation is the

20

process of thinking about a proposed killing before engaging in homicidal conduct.'" 304 Kan. at 465. And the judge added language requested by the State that discussed when premeditation can occur and circumstances from which premeditation can be inferred:

> "'Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand.
>
> "'Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.
>
> "'Premeditation can occur during the middle of a violent episode, struggle, or fight.'" *Bernhardt*, 304 Kan. at 464.

The *Bernhardt* majority held the trial judge did not err in adding both requested passages. 304 Kan. at 472. But see 304 Kan. at 483 (Johnson, J., dissenting) (concluding additions were confusing and contradictory); 304 Kan. at 489 (Luckert, J., dissenting) (same).

This court revisited this language in *Stanley*, 312 Kan. 557. There a majority of the court determined the "best practice" would be to use some of the *Bernhardt* language to explain that premeditation "requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." 312 Kan. at 574. But see 312 Kan. at 574-75 (Luckert, C.J., concurring). Coleman, for the first time on appeal, argues the trial judge should have added this language plus more of the language approved in *Stanley*, 312 Kan. at 574, and *Bernhardt*, 304 Kan. at 472.

Coleman is not the first appellant to argue a trial court erred by not using the language approved in *Stanley*. Like Coleman, these appellants argued we should take a step beyond *Bernhardt* and *Stanley* and hold a trial judge errs by not giving an expanded premeditation instruction, even if not requested to do so at trial. We declined to do so in *State v. Hilyard*, 316 Kan. 326, 335-36, 515 P.3d 267 (2022). *Hillyard*'s reasoning applies here as well.

We began our analysis in *Hilyard* by noting that the instructions as given must constitute error for an appellant to succeed. If the jury instructions properly and fairly stated the law and were not reasonably likely to mislead the jury, then no error exists for this court to correct. See *Hilyard*, 316 Kan. at 334. In other words, "it is immaterial if another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been *more* clear or *more* thorough than the one given." 316 Kan. at 334. We concluded the PIK instruction on premeditation accurately sets forth the core substance of the legal concept of premeditation. 316 Kan. at 335. The pattern PIK instruction standing alone "is legally sufficient and generally not likely to mislead the jury." 316 Kan. at 336.

Coleman seeks to distinguish *Hilyard* because of what he contends were prejudicial arguments by the prosecutors that suggested premeditation can be instantaneous and merely an intentional act. As we have held, however, the prosecutor's argument did not suggest the killing here involved an instantaneous taking of a life. Instead, the prosecutor suggested deliberation was required before each shot was fired, that Coleman deliberated and committed to action before the first shot, and that Coleman remained recommitted with each shot. In other words, the prosecutor's argument as a whole suggested that premeditation persisted even after the first shot was fired, not that it only formed after the first shot.

22

Also, the evidence at trial, unlike that in *Bernhardt* and *Stanley*, did not include evidence of an ongoing dispute in the moments leading up to the fatal acts. Coleman did not testify to any dispute. And no one witnessed what occurred in the moments before Kayzer's death. There was simply no factual record in this case of an ongoing dispute in the moments before Kayzer was shot to suggest the type of instructions provided in *Bernhardt* and *Stanley* would have been legally or factually appropriate.

Just as in *Hilyard*, our analysis ends with our holding that the trial judge's premeditation instruction was sufficient. The district court did not err, and so there is no need to consider prejudice. *Hilyard*, 316 Kan. at 336.

ISSUE 3: NO ERROR IN NOT REMOVING TRIAL COUNSEL

In Coleman's next argument, he contends the trial judge should have removed his trial counsel. Some additional facts provide the context of his arguments.

*Additional Facts*

Throughout the court proceedings, when represented by counsel, Coleman had appointed counsel. A public defender represented Coleman early in the proceedings. Coleman then filed a pro se motion requesting counsel of record be removed. After a hearing, the trial judge noted the primary issue was an alleged lack of communication. The judge denied the motion. Coleman filed another motion requesting replacement counsel again asserting justifiable dissatisfaction. During the hearing, Coleman and his counsel referred to disagreements about defenses that might be pursued, including a potential alibi defense. The court again denied the motion, finding no justifiable dissatisfaction. Following the ruling, Coleman asked to represent himself. The district court informed him it would require a written motion if he wanted to pursue self-representation.

23

Coleman then filed a written motion to represent himself, and the judge granted his motion. After a few months, Coleman asked for and received appointed counsel, with the court reappointing the same counsel who represented Coleman before his request to represent himself. A few months after that, Coleman again asked to have different counsel appointed, alleging a breakdown in communication. The judge expressed concern that Coleman would not communicate with other counsel any better than he was with current counsel. After some discussion, the judge found an irreconcilable conflict and appointed new counsel. The judge cautioned:  "I think it's probably obvious to you from our discussion here that this won't go on lawyer after lawyer, that you are going to need to be able to work with counsel to the best of your ability in the future."

About six months after the judge appointed another attorney, Coleman filed a pro se motion, alleging a complete breakdown of communication with counsel, that counsel was not providing adequate representation, and that counsel had not complied with Coleman's requests. At the hearing, Coleman reduced his issues with counsel to one: "My only issue is the lack of communication." Defense counsel explained the investigation was behind schedule because of the investigator's caseload. She requested a continuance. The judge concluded that he could not "find that there is a breakdown in communication given the circumstances we have here, so I will deny the motion."

A little more than a month later, Coleman again asked the court to remove his counsel, alleging a breakdown of communications, a failure to act with reasonable diligence, and a failure to follow his instructions about developing his defense. At a hearing on the motion, Coleman explained current counsel had not communicated with him since the last proceeding. He acknowledged one visit from her investigator to a family member, but he said counsel otherwise had not seen him or communicated with him since the last hearing. Defense counsel explained that while she had not visited Coleman, she had spent the two weeks before the hearing going through thousands of

24

pages produced in his case and the last three or four weeks making sure she had everything.

The judge recited the legal standard for finding justifiable dissatisfaction with existing counsel, "which has been defined as being a conflict of interest, an irreconcilable conflict, or a complete breakdown of communication between counsel and the defendant." The judge acknowledged "in a perfect world, [defense counsel] would only have one client to deal with. She would be able to communicate at whatever rate her client thought was appropriate . . . ." Coleman interjected, "Just once a period would be fine. She didn't let me know nothing that's going on. . . . She had this case since April . . . [t]hat's five months . . . [w]e ain't talked about it one time." Defense counsel interrupted to clarify she had met him in person to introduce herself and get his side of the story. The judge resumed his ruling, pausing to explain to Coleman his lawyer's role in the case:

> "And I am trying to explain to you that may help this make more sense. She is charged with defending you. She is charged with preparing for trial. And in an ideal world communication would be better. It has not been ideally what I believe—what I would like it to be, sir, and not what you would like it to be, but there is a process here where she has to communicate with her investigator and have him do the things that she needs him to do to prepare for trial. That is a person that works for her at her direction, and she has made the point, and I think it is important for you to note, that much of the work—in fact, almost all of the work that she will do to prepare for your trial is not done in front of you.
>
> "So I will not find that there is justifiable dissatisfaction here. It would be my request [defense counsel] to summarize the things you have done for Mr. Coleman and send him a summary letter at your—as soon as possible, so that Mr. Coleman has some insight about all the things you have done.
>
> "Mr. Coleman, I think you would be surprised at all the things that it takes to prepare for a trial of this nature."

25

*Legal Duties and Standard of Review*

Against this factual backdrop, we consider Coleman's appellate argument.

A defendant has a right under the Sixth Amendment to the United States Constitution to effective assistance of counsel. *State v. McDaniel*, 306 Kan. 595, 606, 395 P.3d 429 (2017). Effective assistance includes a right to representation unimpaired by conflicts of interest or divided loyalties but, in situations with appointed counsel, it does not include the right to counsel of the defendant's choosing. *State v. Pfannenstiel*, 302 Kan. 747, 758-59, 357 P.3d 877 (2015). When a defendant articulates dissatisfaction with counsel, the trial judge has a duty to inquire. Dissatisfaction can be "'demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.[Citations omitted.]'" 302 Kan. at 759-60. Judges may err in exercising their duty—that is, they commit an abuse of discretion—if they (1) fail to conduct an inquiry once aware of a potential conflict, (2) fail to conduct an inquiry in an appropriate matter, in other words, fail to fully investigate the basis for defendant's dissatisfaction with counsel, or (3) make an unreasonable decision based on the facts revealed by an appropriate inquiry. 302 Kan. at 761-62.

Here, Coleman argues the judge unreasonably determined there was no breakdown in communication between him and his counsel. But in making this argument, Coleman shifts the standard from a complete breakdown in communication to a standard requiring an attorney to communicate the details of an attorney's pretrial preparation. For support he cites *Missouri v. Frye*, 566 U.S. 134, 140-45, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012). *Frye* considered the failure to communicate a pretrial plea offer. A plea offer ultimately requires a decision to accept or reject the offer and that is a decision only a client can make. The offer thus must be communicated promptly to the client. In contrast,

Coleman complains that his counsel did not communicate about the investigation and strategy decisions made in preparation for trial; these strategy decisions ultimately remain the attorney's call. See *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). We decline to extend *Frye*'s requirement to communicate regarding a plea offer to communications about other pretrial issues involving strategy decisions the lawyer must make.

Without application of this higher standard, the issue before us is whether the trial judge abused his discretion by finding there had not been a complete breakdown in communication between Coleman and his attorney.

*Analysis*

"'The focus of the justifiable dissatisfaction inquiry is on the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'" *Pfannenstiel*, 302 Kan. at 761-62 (quoting *United States v. Baisden*, 713 F.3d 450, 454 [8th Cir. 2013]). And, as we have acknowledged, "a lack of communication between a defendant and counsel will not always rise to a level of justifiable dissatisfaction." *State v. Brown*, 305 Kan. 413, 425, 382 P.3d 852 (2016). Trial judges thus do not abuse their discretion in not appointing new counsel if they have "'''a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense.'''" 305 Kan. at 425 (quoting *State v. Bryant*, 285 Kan. 970, 986, 179 P.3d 1122 [2008]). An inquiry into justifiable dissatisfaction based on a breakdown of communications may ask whether the limited communication impeded presentation of the defense. See *State v. Staten*, 304 Kan. 957, 972-73, 377 P.3d 427 (2016).

Applying these standards, we find no abuse of discretion. As the State argues, Coleman's complaints are like those raised by the defendant in *State v. Crum*, 286 Kan. 145, 158-59, 184 P.3d 222 (2008). There, the defendant complained the public defender failed to spend sufficient time with him and failed to keep him fully informed about the planned defense. Counsel conceded he had not spent much time with the defendant. But he explained he had developed a defense and was ready to proceed to trial. Shortly before trial, the defendant did more than complain. He formally sought time to retain counsel. The court denied the request.

On appeal, we held the defendant failed to establish justifiable dissatisfaction. In reaching this holding, we noted that the trial judge questioned both the defendant and his appointed counsel. That inquiry resulted in counsel's representation that he was preparing for trial and ready to proceed. We summarized the situation: "Crum's unilateral problem stemmed from a dissatisfaction with the amount of time and attention the appointed counsel devoted directly to Crum. An attorney's inability to shower as much personal attention upon a client as he or she would like does not necessarily rise to the level of a conflict of interest." 286 Kan. at 158-59. Coleman's issues here similarly stem from dissatisfaction with the amount of counsel's time devoted directly to him and not from a complete breakdown in communication.

Coleman also argues the trial judge here erred as a matter of law by concluding at the hearing on Coleman's first motion that counsel's ability to meaningfully communicate was impacted by the incomplete status of the investigation. He relies on professional rules of conduct that require attorneys to keep their clients reasonably informed, to promptly comply with reasonable requests for information, and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." KRPC 1.4 (communication) (2023 Kan. S. Ct. R. at 332). The foundation of this argument fails because the rules of professional conduct do "not constitute

28

ineffective and inadequate counsel as a matter of law. [They are] simply one factor to be considered as a part of the totality of the circumstances in making a judicial determination as to whether an accused has been provided representation by effective counsel." *State v. Wallace*, 258 Kan. 639, 646, 908 P.2d 1267 (1995). This is even more true when the complaint involves an alleged lack of communication under KRPC 1.4 because KRPC 1.4 sets a higher standard than the Sixth Amendment test of a complete breakdown in communication. The trial judge did not err by failing to use KRPC 1.4 as the standard against which to measure counsel's communication.

Coleman alternatively suggests we should find a breakdown in communication because the investigator's failure to make progress could have been caught earlier if defense counsel had regular status updates. But the possibility that earlier and more regular communication might have caught an issue does not mean the lack of communication constituted a complete breakdown in communication establishing justifiable dissatisfaction.

Coleman also notes that his counsel did not improve her communication even after his repeated complaints and the trial judge's suggestions that counsel do better. The trial judge seemed to recognize this, but he also noted that counsel had explained the steps she took to prepare Coleman's defense between the hearings. The trial judge implicitly found her explanations credible and, while noting that she could have done more to communicate with her client, determined the level of communication was not unreasonable. Coleman did not receive as much attention as he might have liked, but that does not as a matter of law require removing defense counsel from the representation. Cf. *Crum*, 286 Kan. at 158-59. The trial judge thus did not make an error of law.

Nor was the trial judge's decision one with which no reasonable person would agree. The trial judge explained his ruling was made in the context of the history of the proceedings and the investigation. Coleman had filed several motions and, at the hearings

29

on the early motions, Coleman expressed his frustration with and a difference of opinion about the proposed defense strategy. The same judge heard all of Coleman's motions and had this context. Given the stage of the proceedings, the stage of the investigation, and the overall history of the proceedings, we conclude others could agree with the trial judge's decision that a complete breakdown in communication had not occurred.

In summary, the trial judge did not abuse his discretion in concluding that things had not reached the level of a complete breakdown in communication supporting a finding of justifiable dissatisfaction.

ISSUE 4: CUMULATIVE ERRORS DO NOT CAUSE REVERSAL

Finally, Coleman argues we should consider the cumulative effect of any errors. Appellate courts analyzing a claim of cumulative error consider the errors in context, the way the trial judge addressed the errors, the nature and number of errors and whether they are connected, and the strength of the evidence. If any of the errors being aggregated are constitutional, the constitutional harmless error test of *Chapman*, 386 U.S. 18, applies. Under that test, the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020).

We have held the prosecutors repeatedly committed prosecutorial error during closing arguments, but we have found no other errors. Considering the prosecutorial errors in the totality of the record, the context of the errors, the number and nature of the errors, and the strength of the evidence, we conclude beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. *Brown*, 316 Kan. at 172-73. As we have discussed, the prosecutor accurately stated the law at other points in the closing and the trial judge correctly instructed the jury on premeditation. In addition, the State outlined convincing evidence of premeditation, including driving to a remote location,

30

taking multiple shots at close range, and attempting to conceal evidence of the murder. Under the totality of the circumstances, we conclude beyond a reasonable doubt that the cumulative effect of the errors did not affect the jury's verdict.

We thus affirm Coleman's conviction.

Affirmed.